# EXHIBIT A

Philip Mauriello Jr., Esq. (SBN )
Arete Law A.P.C.
864 Grand Ave, #1050
San Diego, CA 92109
Telephone: (619) 693-6474
Fax: (619) 693-6474
Email: phil@arete.law

Attorney for Plaintiffs
SHAUN FREDERICKSON, WILLIAM HYDE, HEATHER CAUVEL,

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
**10/27/2021** at 11:52:10 AM
Clerk of the Superior Court
By Keira McCray,Deputy Clerk

## IN THE  SUPERIOR OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| SHAUN FREDERICKSON, an individual; HEATHER CAUVEL, an individual; WILLIAM HYDE, an individual.<br><br>        Plaintiffs,<br><br>    vs<br><br>SAN DIEGO COUNTY BOARD OF SUPERVISORS,<br><br>        Defendant. | **Case No.** 37-2021-00045845-CU-CR-CTL<br><br>**COMPLAINT FOR DECLARATORY RELIEF, PRELIMINARY INJUNCTION, AND ATTORNEYS FEES FOR VIOLATIONS OF:**<br>(1) **LIBERTY OF SPEECH UNDER CAL. CONST. ART. 1 SEC. 2**<br>(2) **FREE SPEECH UNDER FIRST AMENDMENT OF THE US CONST.**<br>(3) **EQUAL PROTECTION UNDER CAL. CONST. ART. 1 SEC. 7**<br>(4)  **LIBERTY CLAUSE CAL. CONST. ART. 1 SEC. 1**<br>(5) **SUBSTANTIVE DUE PROCESS CAL. CONST. ART. 1 SEC. 7** |

COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION FOR
VIOLATIONS OF RIGHTS UNDER CALIFORNIA CONSTITUTION AND FIRST AMENDMENT -
1

**EXHIBIT A**
**002**

# INTRODUCTION

1.      Shaun Frederickson is a father and small business owner who resides in San Diego County.

2.      William Hyde is a small business owner who resides within San Diego County.

3.      Heather Cauvel is a healthcare professional who resides and works in San Diego County.

4.      Collectively they shall hereinafter be "Plaintiffs."

5.      Plaintiffs bring this action under California law to enjoin the San Diego County Board of Supervisors from enacting a Resolution titled "A Resolution of the Board of Supervisors of the County of San Diego Declaring Health Misinformation a Public Health Crisis." (hereinafter "Resolution") Attached herein as **Exhibit A at pg. 39**.

6.      The San Diego County Board of Supervisors ("Defendant") is a governmental body with authority to enact resolutions over the citizens of San Diego County and on August 31, 2021, approved the Resolution stated above to combat "medical misinformation."

7.      The Resolution is a clear infringement on Plaintiff's right to free speech under both the First Amendment of the United States Constitution and the Liberty of Speech clause of the California Constitution. Further, the Resolution as written violates both the vagueness and overbreadth principles of free speech.

8.      Plaintiffs bring this action to contest the constitutionality of Defendant's Resolution.

9.      Plaintiffs seek that relief be made available to them, including equitable and injunctive relief to enjoin the enforcement of Defendant's Resolution and declaratory relief that the Defendant's Resolution violate Plaintiff's civil rights

COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION FOR VIOLATIONS OF RIGHTS UNDER CALIFORNIA CONSTITUTION AND FIRST AMENDMENT - 2

**EXHIBIT A**
**003**

under the Constitution of the State of California and the Constitution of the United States.

10.     Plaintiffs herein bring this action claiming injuries to their rights guaranteed to them under the Constitutions of both California and the United States, said injuries inflicted upon them by the adoption, promulgation, and enforcement of this Resolution.

## JURISDICTION AND VENUE

11.     This action arises under the California Constitution and applicable state law. Plaintiffs allege violations of Article 1, sections 1, 2, and 7 of the California Constitution as well as violations of free speech rights under the First Amendment of the United States Constitution.

12.     Herein, Plaintiffs complain the Defendant has deprived them, are depriving them, and will continue to deprive them, of constitutional rights, including the right to freedom of speech.

13.     The claims asserted by the Plaintiffs are redressable in a civil action for damages, for injunctive relief, and for declaratory judgement.

14.     Venue is proper in this Court under section 393(b) and 394(a) of the Code of Civil Procedure.

## THE PARTIES

15.     Plaintiffs are a collection of residents who reside in San Diego County and bring this lawsuit on behalf of all San Diego County residents whose rights are being violated through the Defendant's actions.

16.     Defendant is and at all times herein mentioned has been, a general law county organized and existing under the law of the State of California with its principal office at 1600 Pacific Highway, San Diego, CA 92101.

## FACTUAL ALLEGATIONS

17.     On August 31, 2021, Defendant held a regularly scheduled meeting to conduct county business and approve resolutions before them.

18.     One item of business was the challenged Resolution.

19.     The Resolution sough to combat what the Defendant deemed "medical misinformation" in an effort to stop the spread of COVID-19. **Exhibit A at 39**.

20.     The Resolution further declared health misinformation a "public health crisis." *Id*.

21.     The Resolution however does not state with any specificity what it defines as "medical misinformation" and how they will specifically go about "combatting it."

22.     By leaving the definition vague, the Defendant has granted themselves standardless discretion to control and restrict speech it deems as "medical misinformation."

23.     Further, since the Resolution seeks to restrict speech based on its content, the regulation is content based, and content-based regulation is presumed to be an unconstitutional violation of free speech. *National Institute of Family and Life Advocates v. Becerra* (2018) 138 S.Ct. 2361, 2371

### FIRST CLAIM FOR RELIEF

**Liberty of Speech, Article 1, Section 2, of the California Constitution**

24.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

25.     In Count 1, Plaintiffs seek remedies based on Defendant's violation of their rights under Article I, § 2 of the California Constitution, including the right to freedom of speech.

COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION FOR VIOLATIONS OF RIGHTS UNDER CALIFORNIA CONSTITUTION AND FIRST AMENDMENT - 4

EXHIBIT A
005

26.     In California, "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." Cal. Const., art. I, § 2.

27.     "The California Supreme Court has recognized that the California Constitution is 'more protective, definitive and inclusive of rights to expression and speech' than the First Amendment to the United States Constitution." *Rosenbaum v. City and County of San Francisco* (9th Cir. 2007) 484 F.3d 1142, 1167.) "[A]rticle I's right to freedom of speech, unlike the First Amendment's, is unbounded in range" "and '"unlimited' in scope." *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 492–493.

28.     Defendant's Resolution violates the Liberty of Speech clause, both facially and as applied to Plaintiffs.

29.     The prohibition of speech under the Defendant's Resolution is complete.

30.     Because a complete prohibition on expression is subject to strict scrutiny under the federal Constitution, the Defendant's Resolution can only survive if they are in service of a compelling government interest and are served by means narrowly tailored to serve the purpose thereof.

31.     While the prevention and control of a public health pandemic may, generally, be categorized, without more, as a compelling government interest, the Defendant has not relied on such an overarching interest as compelled them to conclude that all discourse and speech among the residents of San Diego County present risks of harm to that interest.

32.     Further, the lack of definition of what is "medical misinformation" or a "falsehood" is vague. By failing to specifically define what they deem to be

COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION FOR VIOLATIONS OF RIGHTS UNDER CALIFORNIA CONSTITUTION AND FIRST AMENDMENT - 5

**EXHIBIT A**
**006**

misinformation, Defendant has granted themselves standardless discretion over the regulation of speech.

33.    The Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Resolution by Defendant.

34.    Accordingly, the Plaintiffs are entitled to a declaratory judgement, an injunction, and damages, all as further prayed in their in their Prayer for Relief.

35.    Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5.

**SECOND CLAIM FOR RELIEF**

**Violation of Free Speech Rights Under First Amendment of the United States Constitution**

36.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

37.    Plaintiffs seek remedies for Defendant's violation of Plaintiffs' right to free speech under the First Amendment of the Constitution.

38.    In addition to infringements upon Plaintiffs' right to free speech under the First Amendment, Defendant's Resolution also violates the vagueness and overbreadth doctrines.

39.    The Resolution as written and executed is vague in its definition of what is "medical misinformation." As a basic principle of due process, enactment of any speech related government action is void if prohibitions are not clearly defined. *Grayned v. City of Rockford*, (1972) 408 U.S. 104, 108.

40.     Vagueness of content-based regulation of speech raises special concerns under First Amendment because of obvious chilling effect of such regulation on free speech. *Reno v. ACLU*, (1997) 521 U.S. 844, 872.

41.     In the present case, the Resolution raises two issues due to its vagueness. First, that regulated parties should know what is required of them so they can act accordingly, and second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way. *FCC v. Fox TV Stations, Inc.*, (2012) 567 U.S. 239, 240; *Grayned v. City of Rockford*, (1972) 408 U.S. 104, 108-109. Here, the Resolution does not properly apprise citizens of what is "medical misinformation" and because of this failure to properly define it, Defendant is free to "combat" the speech it so chooses in an arbitrary and discriminatory manner.

42.     The Resolution on its face runs afoul of the overbreadth doctrine whereby the Defendant has bestowed upon itself the power to regulate the time, place, and manner of expressive or communicate conduct in a standardless discretionary manner. *Broadrick v Oklahoma* (1973) 413 US 601, 612-614.

43.     The Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Resolution by Defendant.

44.     Accordingly, the Plaintiffs are entitled to a declaratory judgement, an injunction, and damages, all as further prayed in their in their Prayer for Relief.

45.     Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5.

COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION FOR VIOLATIONS OF RIGHTS UNDER CALIFORNIA CONSTITUTION AND FIRST AMENDMENT - 7

EXHIBIT A
008

**THIRD CLAIM FOR RELIEF**

**Equal Protection Clause, Article 1, Section 7, of the California Constitution**

46.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

47.     In California "[a] person may not be … denied equal protection of the laws." Cal. Const., art. I, § 7. "California's equal protection laws possess an independent validity from the Fourteenth Amendment." *Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 893.

48.     Defendant's Resolution violates Article 1, section 7, of the California Constitution, both facially and as applied to Plaintiffs.

49.     The equal protection of the laws assures that people who are similarly situated for purposes of a law are generally treated similarly by the law.

50.     "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. This initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged." *Cooky v. Superior Court* (2002) 29 Cal.4th 228, 253 [citations omitted]; *see also DiMartile v. Cuomo* (N.D.N.Y. 2020), No. 1:20-CV-0859 (GTS/CFH), 2020 WL 4558711 [pandemic restrictions violated equal protection guarantees].

51.     Under Article 1, section 2, of the California Constitution, all California citizens have the right to free speech.

52.     Plaintiffs will ultimately be treated differently than other California citizens under Defendant's Resolution because the Resolution applies as written to only citizens of San Diego County.

COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION FOR VIOLATIONS OF RIGHTS UNDER CALIFORNIA CONSTITUTION AND FIRST AMENDMENT - 8

**EXHIBIT A**
**009**

53.     This places an undue burden on Plaintiffs' right to free speech as San Diego County residents yet does not place an undue burden on any person outside of San Diego County, thus creating different applications of constitutional rights. A person outside of San Diego County would not be subject to this Resolution and its restrictions.

54.     The arbitrary definition of "medical misinformation" is not narrowly tailored to further a compelling government interest.

55.     By treating Plaintiffs differently under this Resolution as residents of San Diego County, Defendant has violated Article 1, section 7, and the guarantee to treat all citizens equally under the law.

56.     Plaintiffs have and will suffer serious and irreparable harm to their constitutional rights.

57.     Plaintiffs will continue to suffer serious and irreparable harm unless the Defendant is enjoined from implementing and enforcing the Resolution complained of herein.

58.     Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5.

## FOURTH CLAIM FOR RELIEF

## Liberty Clause: Article 1, Section 1, of the California Constitution

59.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION FOR VIOLATIONS OF RIGHTS UNDER CALIFORNIA CONSTITUTION AND FIRST AMENDMENT - 9

EXHIBIT A
010

60.     The California Constitution guarantees to the Plaintiffs the right to liberty, the right to acquire, possess, and protect property, and the right to pursue and obtain safety, happiness, and privacy.

61.      The Resolution has interfered with Plaintiffs' rights and liberties as set forth under Article 1, Section 1, of the California Constitution, depriving Plaintiff of the use, enjoyment and ability to exercise their right to free speech.

62.     Defendant has failed to provide probable cause to establish a legitimate exercise of the police public health and safety power to declare a "public health crisis" on "misinformation."

63.     The Resolution complained of herein is arbitrary, unreasonable, unwarranted, and wrongful, and constitute oppressive interference with the personal liberty of the Plaintiffs in the absence of any basis therefore.

64.     Plaintiffs have no adequate remedy at law for this deprivation of the right to liberty under the California Constitution.

65.     Plaintiffs will suffer serious and irreparable harm to their constitutional right to liberty under the California Constitution unless Defendant is enjoined from implementing and enforcing the Resolution.

66.     California Code of Civil Procedure section 1021.5 authorizes the award of attorneys' fees to the Plaintiff in this case under the terms of that provision of law.

## FIFTH CLAIM FOR RELIEF

## Right to Liberty and Substantive Due Process: Article 1, Sections 1 and 7, of the California Constitution

67.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION FOR VIOLATIONS OF RIGHTS UNDER CALIFORNIA CONSTITUTION AND FIRST AMENDMENT - 10

EXHIBIT A
011

68.    In California, "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const., art. I, § 1. "A person may not be deprived of life, liberty, or property without due process of law" Cal. Const., art. I, § 7.

69.    To justify any restriction on liberty and constitutional rights of a citizen regarding a public health crisis, it must be based on "reasonable grounds." *Ex Parte Marin* (1948) 83 Cal.App.2d 164.

70.    Defendant has not proven in their Resolution any probable cause or link to public health and what they unilaterally deem as "misinformation" to warrant the need to restrict Plaintiff's free speech rights.

71.    Defendant's Resolution was approved and thus immediately violates Plaintiffs' right to free speech without due process of law.

72.    Plaintiffs have no adequate remedy at law.

73.    Plaintiffs will continue to suffer serious and irreparable harm unless the Defendant is enjoined from implementing and enforcing the Resolution complain of herein.

74.    Plaintiffs have found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees and costs pursuant to Code of Civil Procedure Section 1021.5.

75.    Accordingly, Plaintiffs are entitled to declaratory judgement, an injunction, and damages, all as further prayed in their Prayer for Relief.

# PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that this Court:

a. Declare the Resolution, as identified herein, as unconstitutional and null and void, and of no effect;

b. Grant a TRO and preliminary injunction to prevent the Defendant from enforcing or implementing this Resolution until this Court decides the merits of this lawsuit;

c. Permanently enjoin Defendant, from enforcing the Resolution;

d. Award Plaintiff their costs and reasonable attorneys' fees incurred in this action under Code Civil Procedure Section 1021.5; and

e. Grant all other such relief as the Court may deem just and proper.

Dated: October 25th, 2021

ARETE LAW A.P.C.

_____

Philip Mauriello Jr. Esq.
Attorney for the Plaintiffs
WILLIAM HYDE
HEATHER CAUVEL
SHAUN FREDERICKSON

COMPLAINT FOR DECLARATORY RELIEF AND PRELIMINARY INJUNCTION FOR VIOLATIONS OF RIGHTS UNDER CALIFORNIA CONSTITUTION AND FIRST AMENDMENT - 12

EXHIBIT A
013

**VERIFICATION**

I, William Hyde, declare:

I am the Plaintiff in this above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters in are therein alleged on information and belief as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  Oct 26, 2021

*Billy Hyde*
_____

William Hyde

# VERIFICATION

I, Heather Cauvel, declare:

I am the Plaintiff in this above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters in are therein alleged on information and belief as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: Oct 26, 2021

Heather Cauvel

## VERIFICATION

I, Shaun Frederickson, declare:

I am the Plaintiff in this above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters in are therein alleged on information and belief as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: Oct 26, 2021


Shaun Frederickson (Oct 26, 2021 16:49 PDT)

Shaun Frederickson

# Exhibit A

STATEMENT OF PROCEEDINGS
COUNTY OF SAN DIEGO BOARD OF SUPERVISORS
REGULAR MEETING
MEETING AGENDA
**TUESDAY, AUGUST 31, 2021, 9:00 AM**
COUNTY ADMINISTRATION CENTER, ROOM 310
1600 PACIFIC HIGHWAY, SAN DIEGO, CALIFORNIA

Order of Business

A.    REGULAR SESSION:  Meeting was called to order at 9:05 a.m.

PRESENT:  Supervisors Nathan Fletcher, Chair; Nora Vargas, Vice-Chair; Joel Anderson; Terra Lawson-Remer; Jim Desmond; also, Andrew Potter, Clerk of the Board of Supervisors.

(Please note, California Governor Gavin Newsom issued Executive Order N-29-20 on March 17, 2020, relating to the convening of public meetings in response to the COVID-19 pandemic. Pursuant to the Executive Order, and to maintain the orderly conduct of the meeting, members of the Board of Supervisors attended the meeting via teleconference and participated in the meeting to the same extent as if they were present.)

B.    Invocation was led by Bishop Ramón Bejarano, Diocese of San Diego.

C.    Pledge of Allegiance was led by Mr. Einer Lohner's class from McMillin Elementary, Chula Vista.

D.    Presentation or Announcement of Proclamations and Awards:

Vice Chair Nora Vargas presented a proclamation declaring August 31, 2021, to be South Bay Community Services Day throughout the County of San Diego.

Supervisor Terra Lawson-Remer presented a proclamation declaring August 2021, to be Muslim Appreciation Month throughout the County of San Diego.

Supervisor Jim Desmond presented a proclamation declaring August 31, 2021, to be San Diego Sexual Assault Response Team Day throughout the County of San Diego.

E.    Non-Agenda Public Communication: Opportunity for members of the public to speak to the Board on any subject matter within the Board's jurisdiction but not an item on today's agenda.

F.    Approval of the Statement of Proceedings/Minutes for the meeting of August 17, 2021.

**ACTION:**
ON MOTION of Supervisor Fletcher, seconded by Supervisor Vargas, the Board of Supervisors approved the Statement of Proceedings/Minutes for the meeting of August 17, 2021.

AYES:  Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

**EXHIBIT A**
**018**

G.      Formation of Consent Calendar

H.      Discussion Items

I.      Board Member Committee Updates. This is an opportunity for Members of the Board to
        provide informational updates on their committee assignments. No action may be taken.

NOTICE: THE BOARD OF SUPERVISORS MAY TAKE ANY ACTION WITH RESPECT TO THE
ITEMS INCLUDED ON THIS AGENDA. RECOMMENDATIONS MADE BY COUNTY STAFF DO
NOT LIMIT ACTIONS THAT THE BOARD OF SUPERVISORS MAY TAKE. MEMBERS OF THE
PUBLIC SHOULD NOT RELY UPON THE RECOMMENDATIONS IN THE BOARD LETTER AS
DETERMINATIVE OF THE ACTION THE BOARD OF SUPERVISORS MAY TAKE ON A
PARTICULAR MATTER.

**Board of Supervisors' Agenda Items**

| Category | # | Subject |
|---|---|---|
| Public Safety | 1. | NOTICED PUBLIC HEARING:<br>INITIATION OF DISSOLUTION OF COUNTY SERVICE AREA NO. 69 AND TRANSFER OF FUNDING AND ADMINISTRATIVE OVERSIGHT FOR AMBULANCE SERVICES TO THE CITY OF SANTEE AND LAKESIDE FIRE PROTECTION DISTRICT AS SUCCESSOR AGENCIES |
| | 2. | SAN DIEGO COUNTY FIRE - APPROVAL OF ACTIONS RELATED TO AMERICAN RESCUE PLAN ACT FUNDS ALLOCATED FOR INVESTMENT IN LOCAL, INDEPENDENT FIRE DISTRICTS<br>[FUNDING SOURCE: ARPA FUNDS ALLOCATED DIRECTLY TO THE COUNTY, PLUS ESTIMATED INTEREST EARNINGS] |
| | 3. | REPORT TO THE BOARD ON PUBLIC SAFETY POWER SHUTOFFS: ADDRESSING GAPS AND IMPROVING COORDINATION |
| | 4. | SHERIFF - ACCEPTANCE OF DONATIONS FROM THE SAN DIEGO HONORARY DEPUTY SHERIFF'S ASSOCIATION |
| Health and Human Services | 5. | RECEIVE REPORT ON ACCOMPLISHMENTS OF THE $50 MILLION INNOVATIVE HOUSING TRUST FUND |
| | 6. | ADVANCING IMMEDIATE AND LONG-TERM HOUSING PRIORITIES THROUGH THE INNOVATIVE HOUSING TRUST FUND<br>[FUNDING SOURCE: GENERAL FUND] |

**EXHIBIT A**
**019**

7.  TRANSFORMATIVE HOUSING SOLUTIONS THAT ADVANCE EQUITY, SUSTAINABILITY, AND AFFORDABILITY FOR ALL
    [FUNDING SOURCE: UNASSIGNED GENERAL FUND FUND BALANCE]

8.  AUTHORIZE COMPETITIVE SOLICITATION FOR AN ADMINISTRATOR FOR HOMELESS HOUSING AND SUPPORT TO SERVE PEOPLE WITH HIGH NEEDS EXPERIENCING HOMELESSNESS IN SAN DIEGO COUNTY
    [FUNDING SOURCES:  EXISTING ALLOCATIONS OF STATE FUNDING FROM HOUSING FUNDS FOR WHOLE PERSON WELLNESS AND THE HOUSING DISABILITY ADVOCACY PROGRAM]

Financial and General Government

9.  NOTICED PUBLIC HEARING:
    GENERAL SERVICES - APPROVAL OF AMENDMENTS TO DISPOSITION AND DEVELOPMENT AGREEMENTS AND GROUND LEASES FOR AFFORDABLE HOUSING - 1501/1555 SIXTH AVENUE, 5255 MT. ETNA DRIVE, 6950 LEVANT STREET AND 1464 MONTECITO ROAD

10. FULL VETTING OF THE BENEFITS, POTENTIAL RATE PAYER COST INCREASES AND LIABILITIES ASSOCIATED WITH COMMUNITY CHOICE AGGREGATION

11. AUTHORIZATION TO JOIN COMMUNITY CHOICE ENERGY JOINT POWERS AUTHORITY AND TAKE RELATED ACTIONS
    [FUNDING SOURCE: UNASSIGNED GENERAL FUND FUND BALANCE]

12. NEIGHBORHOOD REINVESTMENT PROGRAM GRANT (DISTRICT: 4)
    [FUNDING SOURCE: GENERAL PURPOSE REVENUE]

13. COMMUNITY ENHANCEMENT PROGRAM GRANTS (DISTRICT: 3)
    [FUNDING SOURCE: TRANSIENT OCCUPANCY TAX REVENUES]

14. RECEIVE THE REPORT BACK ON THE SCOPE, ROLES AND RESPONSIBILITIES, INCLUDING THE NUMBER OF STAFF AND TYPE OF POSITIONS FOR INITIAL EXECUTION OF THE DUTIES FOR THE OFFICE OF LABOR STANDARDS AND ENFORCEMENT
    [FUNDING SOURCE: GENERAL FUND FUND BALANCE]

**EXHIBIT A**
**020**

|       | 15. | ADVANCING FEDERAL ADVOCACY EFFORTS |
|-------|-----|-----|
|       | 16. | AMENDMENTS TO THE COMPENSATION ORDINANCE AND ADMINISTRATIVE CODE (8/31/2021 - First Reading; 9/14/2021 - Second Reading) |
|       | 17. | APPOINTMENTS: VARIOUS |
| Communications Received | 18. | COMMUNICATIONS RECEIVED |
| Health and Human Services | 19. | FRAMEWORK FOR OUR FUTURE: DECLARING HEALTH MISINFORMATION A PUBLIC HEALTH CRISIS |
| Closed Session | 20. | CLOSED SESSION |
| Public Communication | 21. | PUBLIC COMMUNICATION |

**EXHIBIT A**
**021**

1.   **SUBJECT:**          **NOTICED PUBLIC HEARING:**
                           **INITIATION OF DISSOLUTION OF COUNTY SERVICE AREA**
                           **NO. 69 AND TRANSFER OF FUNDING AND ADMINISTRATIVE**
                           **OVERSIGHT FOR AMBULANCE SERVICES TO THE CITY OF**
                           **SANTEE AND LAKESIDE FIRE PROTECTION DISTRICT AS**
                           **SUCCESSOR AGENCIES (DISTRICT: 2)**

**OVERVIEW**
Established by the County of San Diego Board of Supervisors (Board) in 1974, County
Service Area No. 69 (CSA 69) provides funding and administrative oversight for Advanced
Life Support (ALS) ambulance transport services within the City of Santee, Lakeside Fire
Protection District, and the surrounding unincorporated communities of Pepper Drive and
Bostonia, covering approximately 63 square miles of unincorporated east county. Under
governance of the Board, administrative oversight is provided by the County of San Diego
Emergency Medical Services Office (County EMS). Through a contract with the County, the
City of Santee and the Lakeside Fire Protection District receive funding from the County to
provide ALS ambulance transport services to CSA 69.

In April 2019, County EMS retained a consultant to evaluate the effectiveness and
sustainability of the current management system and service delivery model and present their
findings in a white paper. The review indicated a fundamental transformation of the CSA
structure was long overdue and proposed the dissolution of CSA 69 and transfer of funding
and administrative oversight for ALS ambulance transport services to the City of Santee and
Lakeside Fire Protection District. The dissolution will align responsibilities and provide local
control for administrative oversight, management of tax revenue, and provision of services.

Today's request seeks approval to take the necessary actions to initiate the dissolution of CSA
69 and transfer funding and administrative oversight for ALS ambulance transport services to
the City of Santee and Lakeside Fire Protection District as successor agencies.

**RECOMMENDATION(S)**
**SUPERVISOR JOEL ANDERSON**
On August 31, 2021:
1.   Find that adoption of the proposed resolution of intention for dissolution of County
     Service Area No. 69 is subject to the California Environmental Quality Act (CEQA) but
     exempt from additional analysis pursuant to CEQA Guidelines Section 15061(b)(3)
     because it can be seen with certainty that there is no possibility that the activity in
     question may have a significant effect on the environment. Sections 15378(b)(4) and (5)
     also apply because the proposed action involves government fiscal activities that do not
     involve any commitment to any specific project that may result in a potentially
     significant physical impact on the environment and because the proposed action involves
     organizational or administrative activities of governments that will not result in direct or
     indirect physical changes in the environment. Additionally, CEQA Guidelines Section
     15320 applies because the proposed action involves a reorganization of local
     governmental agencies where the changes do not alter the geographical area in which
     existing powers are exercised.

TUESDAY, AUGUST 31, 2021                                                          5

**EXHIBIT A**
**022**

2. Adopt the Resolution entitled: RESOLUTION OF INTENTION OF THE BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO TO HOLD A PUBLIC HEARING  TO INITIATE PROCEEDINGS FOR DISSOLUTION OF COUNTY SERVICE AREA NO. 69 (Attachment A, on file with the Clerk of the Board).

3. Direct the Chief Administrative Officer to develop the resolution of application to the San Diego County Local Agency Formation Commission and the plan for service prior to the October 5, 2021 board meeting.

If, on August 31, 2021, the Board takes action as recommended, then on October 5, 2021:

1. Find that adoption of the proposed resolution of application for dissolution of County Service Area No. 69 is subject to the California Environmental Quality Act (CEQA) but exempt from further review pursuant to CEQA Guidelines Section 15061(b)(3) because it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment. Sections 15378(b)(4) and (5) also apply because the proposed action involves government fiscal activities that do not involve any commitment to any specific project that may result in a potentially significant physical impact on the environment and because the proposed action involves organization or administrative activities of governments that will not result in direct or indirect physical changes in the environment. Additionally, CEQA Guidelines Section 15320 applies because the proposed actions involve a reorganization of local governmental agencies where the changes do not alter the geographical area in which existing powers are exercised.

2. Adopt the Resolution entitled: RESOLUTION OF APPLICATION OF THE BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO TO INITIATE PROCEEDINGS WITH THE SAN DIEGO COUNTY LOCAL AGENCY FORMATION COMMISSION FOR DISSOLUTION OF COUNTY SERVICE AREA NO. 69.

3. Authorize County departments to take all actions necessary to develop and adopt a County Service Area No. 69 Transition Plan with the City of Santee and Lakeside Fire Protection District.

4. Authorize the Auditor and Controller, and other County departments, to take all actions necessary to transfer funding and administrative oversight for ambulance services from County Service Area No. 69 to the City of Santee and Lakeside Fire Protection District.

5. Direct the Clerk of the Board to provide a certified copy of the Resolution of Application to the San Diego County Local Agency Formation Commission.

**EQUITY IMPACT STATEMENT**

The San Diego County Emergency Medical Services (EMS) Office is committed to assuring that equity is considered in policy development, EMS resource availability, and EMS service provision in all areas where the County has jurisdictional influence and/or authority. Community feedback received at public meetings indicates residents support the dissolution of County Service Area No. 69 and the transfer of funding and administrative oversight for Advanced Life Support ambulance transport services to local jurisdictions.

**EXHIBIT A**
**023**

**FISCAL IMPACT**
If approved, this request will transfer future property tax revenue received from County Service Area No. 69 (CSA 69) to the City of Santee and Lakeside Fire Protection District. The property tax and benefit fee revenue generated for CSA 69 totaled approximately $3,492,662 in Fiscal Year 2020-21. A review of the assets and liabilities will be conducted as due diligence by the San Diego County Local Agency Formation Commission. There will be no change in net General Fund cost and no additional staff years.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Anderson, seconded by Supervisor Desmond, the Board of Supervisors closed the Hearing and took action as recommended, adopting Resolution No. 21-141, entitled: RESOLUTION OF INTENTION OF THE BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO TO HOLD A PUBLIC HEARING TO INITIATE PROCEEDINGS FOR DISSOLUTION OF COUNTY SERVICE AREA NO. 69; and, continued the item to October 5, 2021.

AYES:        Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

2.      **SUBJECT:    SAN DIEGO COUNTY FIRE - APPROVAL OF ACTIONS RELATED TO AMERICAN RESCUE PLAN ACT FUNDS ALLOCATED FOR INVESTMENT IN LOCAL, INDEPENDENT FIRE DISTRICTS (DISTRICTS: ALL)**

**OVERVIEW**
On June 8, 2021 (3), the San Diego County Board of Supervisors (Board) approved the use of American Rescue Plan Act (ARPA) funding for Infrastructure, allocating $4 million for investment in local, independent fire districts.

Today's recommendation seeks Board approval for actions related to the use of the approved American Rescue Plan Act funding for Infrastructure, by establishing appropriations of $4 million in San Diego County Fire for allocation to local, independent fire districts.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**
1.   Approve the allocation methodology and authorize San Diego County Fire to take actions related to the use of American Rescue Plan Act funding for Infrastructure.

2.   Transfer appropriations of $4,000,000 from Finance Other, Other Charges to San Diego County Fire, Contribution to Other Agencies for allocation to local, independent fire districts.

**EQUITY IMPACT STATEMENT**
To provide for transparency and open government, the County of San Diego considered public input on the use of future federal and State COVID-19 stimulus funding. Although San Diego County, the 18 incorporated cities within the County, and other local public agencies have received federal stimulus funding related to COVID-19, unincorporated fire protection

districts have not received any funding to mitigate the impact of COVID-19. The allocation of $4 million of American Rescue Plan Act (ARPA) funds will help provide a more equitable distribution of funding across the region and ensure that unincorporated residents and fire district employees get much needed support.

**FISCAL IMPACT**
Funds associated with this request are not included in the Fiscal Year 2021-22 Operational Plan in San Diego County Fire. If approved, today's action will result in costs and revenue of $4,000,000 in San Diego County Fire for direct distribution to local, independent fire districts. The funding source is $4 million in ARPA funds allocated directly to the County, plus estimated interest earnings. There will be no change in net General Fund cost and no additional staff years.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Fletcher, seconded by Supervisor Anderson, the Board of Supervisors took action as recommended.

AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

3.      SUBJECT:   **REPORT TO THE BOARD ON PUBLIC SAFETY POWER SHUTOFFS: ADDRESSING GAPS AND IMPROVING COORDINATION (DISTRICTS: ALL)**

**OVERVIEW**
On March 2, 2021, the Board of Supervisors directed the Chief Administrative Officer (CAO) to consult with stakeholders and produce a report and recommendations to increase regional resiliency for Public Safety Power Shutoff (PSPS) events.

As a result, the Office of Emergency Services (OES) formed the 2021 PSPS Regional Resiliency Working Group, with members from the County of San Diego, State of California, federal, city and tribal governments, the Fire Chiefs Association, SDG&E, County Water Authority, County Office of Education, non-governmental organizations (NGOs), mobile providers, and the Air Pollution Control District. The working group analyzed existing PSPS gaps and identified opportunities to further improve mitigation strategies, operational area coordination, and lessen the impacts of PSPS on residents. OES also requested public input, conducted a survey, and hosted a PSPS Public Forum. The collection of input from the public will be ongoing through a survey posted on the Office of Emergency Services' website.

Today's action is to receive and review the staff report addressing operational area coordination and PSPS mitigation opportunities.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**
Receive and review the August 2021 PSPS Regional Resiliency Report addressing Public Safety Power Shutoff (PSPS) operational area coordination and mitigation recommendations.

**EXHIBIT A**
**025**

**EQUITY IMPACT STATEMENT**
The County of San Diego Office of Emergency Services (OES) recognizes natural and human-caused hazards may increase systemic inequities throughout the region. OES is committed to equitable and inclusive coordination of all-hazard planning, mitigation, response, and recovery to foster strong, capable, and prepared communities. Therefore, OES formed the 2021 Public Safety Power Shutoff (PSPS) Regional Resiliency Working Group to seek PSPS-related feedback through stakeholder meetings and surveys to affected partners and residents. The feedback received includes suggestions regarding County policy, interagency coordination, outreach, and equipment to address the county's energy needs during a PSPS event. These potential actions could improve PSPS experiences for low-income populations, individuals with disabilities, individuals with access and functional needs, underserved communities and populations that are more likely to be adversely impacted during a power shutoff.

**FISCAL IMPACT**
There is no fiscal impact associated with the Board's acceptance of the report. There is no change to net General Fund cost and no additional staff years.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Desmond, seconded by Supervisor Anderson, the Board of Supervisors took the following actions:
1. Received and reviewed the August 2021 PSPS Regional Resiliency Report addressing Public Safety Power Shutoff (PSPS) operational area coordination and mitigation recommendations.
2. Directed the Chief Administrative Officer to:
   a. Work with external partners to explore ways to operate traffic control devices during power outages for longer periods of time, particularly along evacuation routes.

   b. Maximize investments in undergrounding funds, particularly in areas that are impacted by the most wind events.

   c. Secure additional CPUC Rule 20 funding for San Diego County.

   d. Continue to pursue State Community Power Resilience Allocation Program to resume previous funding levels.

   AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond


4.       **SUBJECT:    SHERIFF - ACCEPTANCE OF DONATIONS FROM THE SAN DIEGO HONORARY DEPUTY SHERIFF'S ASSOCIATION (DISTRICTS: ALL)**

**OVERVIEW**
County of San Diego Administrative Code Article III, Section 66 Acceptance of Gifts and Board of Supervisors Policy A-112, Acceptance and Use of Gifts and Donations, permit the acceptance of gifts and donations by the administrative heads of each department in the County, subject to approval by the Board of Supervisors.

**EXHIBIT A**
**026**

The San Diego Honorary Deputy Sheriff's Association (HDSA) is a group of local business and community leaders with a long history of providing support to the San Diego Sheriff's Department. This is a request to approve the acceptance of donations totaling $67,102, including $58,784 cash for the Sheriff's Canine program and bike racks for Emergency Services valued at $8,318.

**RECOMMENDATION(S)**
**SHERIFF**
1. In accordance with County of San Diego Administrative Code Article III, Section 66 Acceptance of Gifts and Board of Supervisors Policy A-112, Acceptance and Use of Gifts and Donations, accept cash valued at $58,784; and equipment valued at $8,318 from the San Diego Honorary Deputy Sheriff's Association.

2. Authorize the Chair of the Board of Supervisors to sign a letter of appreciation on behalf of the Board of Supervisors and the County of San Diego to the San Diego Honorary Deputy Sheriff's Association.

**EQUITY IMPACT STATEMENT**
The donations totaling $58,784 of cash from the HDSA will be used to purchase canines for four Sheriff's units. The canines are critical resources and will enhance the level of service provided by the department. The canines specifically will ensure the welfare and safety of people in the community and in the department's care. The bike racks donated by the HDSA will assist Emergency Services in protecting the public during events.

**FISCAL IMPACT**
There is no direct fiscal impact associated with today's request to accept donations valued at $67,102 from the San Diego Honorary Deputy Sheriff's Association. Future ongoing costs associated with care of the canines and equipment stemming from this donation will be included in future years' Operational Plan in the Sheriff's department. There will be no change in net General Fund cost and no additional staff years.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Fletcher, seconded by Supervisor Vargas, the Board of Supervisors took action as recommended.

AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

5.      **SUBJECT:    RECEIVE REPORT ON ACCOMPLISHMENTS OF THE $50 MILLION INNOVATIVE HOUSING TRUST FUND (DISTRICTS: ALL)**

**OVERVIEW**
On June 20, 2017 (21), the San Diego County Board of Supervisors (Board) established the Innovative Housing Trust Fund (Trust Fund) to address shrinking affordable housing options across the region. The Board has provided a total of $50 million for the Trust Fund to foster the creation of affordable housing; this total is comprised of $25 million invested at the establishment of the Trust Fund and a second infusion of $25 million added on April 30, 2019

**EXHIBIT A**
**027**

(7). The Trust Fund is the first of its kind, being the first locally funded/locally administered program to offer funding for affordable housing in the entire San Diego region.

The $50 million invested in the Trust Fund was made available through four Notices of Funding Availability (NOFA) between December 2017 and March 2020. In less than three years the Trust Fund leveraged $567 million in other public and private funds to create and preserve 1,397 permanent affordable housing units within 20 developments in 15 communities throughout San Diego County. The inventory of County of San Diego (County) funded and restricted affordable housing increased by 30% due to the Board's investment in the Trust Fund.

The Trust Fund spurs the production and preservation of affordable housing through enhanced partnerships with regional stakeholders. These efforts align with the County's *Live Well San Diego* vision for a healthy, safe, and thriving region along with recent Board efforts in the Framework for Our Future as this report celebrates the accomplishments of the Trust Fund and promotes transparency and open government by ensuring the data related to the $50 million is available for the public and Board. Additionally, today's action confirms the equitable distribution of resources in 15 communities that will gain much needed permanent affordable housing.

Today's action is a request for the Board to receive the report on outcomes of the Innovative Housing Trust Fund.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**
1.   Find in accordance with Section 15060(c)(3) of the California Environmental Quality Act (CEQA) that the receipt of the report on the status of the Innovative Housing Trust Fund is administrative in nature and is not a project as defined in CEQA Guidelines Section 15378.

2.   Receive the report on outcomes of the Innovative Housing Trust Fund.

**EQUITY IMPACT STATEMENT**
The successes of the Innovative Housing Trust Fund (Trust Fund) reported to the San Diego County Board of Supervisors (Board) today, contributed to the County of San Diego's efforts in addressing local housing shortages which help to increase access to quality affordable housing. Additionally, this resulted in the creation of private sector jobs and economic opportunities in San Diego County. The Trust Fund was implemented with thoughtful consideration from the Board and community stakeholders. It is anticipated that members of all equity seeking groups will benefit from the developments assisted by the Trust Fund. Units created will serve an estimated 18,000 low-income families, seniors, veterans, developmentally disabled, homeless, and homeless with serious mental illness through-out the 99-year affordability period.

**FISCAL IMPACT**
There is no fiscal impact associated with today's action. There will be no change in net General Fund costs and no additional staff years.

**BUSINESS IMPACT STATEMENT**
N/A

**EXHIBIT A**
**028**

ACTION:
ON MOTION of Supervisor Fletcher, seconded by Supervisor Vargas, the Board of
Supervisors took action as recommended.

AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

6.     **SUBJECT:     ADVANCING IMMEDIATE AND LONG-TERM HOUSING
                PRIORITIES THROUGH THE INNOVATIVE HOUSING TRUST FUND
                (DISTRICTS: ALL)**

**OVERVIEW**
Since its inception in 2017, the County's Innovative Housing Trust Fund (IHTF) has proven to
be an important financing tool for funding affordable housing throughout the region. The first
two rounds of the program totaled $50 million in County investment and spurred the
development of 1,397 affordable units across 20 development projects, leveraging over $560
million in public and private capital sources.

On April 6, 2021, the San Diego County Board of Supervisor's directed the Chief
Administrative Officer to refer for budget consideration the establishment of $25 million in
additional funding to expand the IHTF and support complementary approaches to tackle San
Diego's affordable housing crisis. The Board also directed the Chief Administrative Officer to
conduct outreach to community stakeholders to identify ways to enhance the IHTF program to
better meet financing needs and increase affordable housing production across the County.
The Fiscal Year 2021-22 Operational Plan was adopted on June 29, 2021, and included $25
million funding for this request, though further Board direction is needed for use of the funds
associated with the $25 million affordable housing allocation.

On July 21, 2021, County staff sent a memorandum to the Board of Directors summarizing the
results of the outreach and engagement with community stakeholders, including feedback on
potential changes to existing IHTF Notice of Funding Availability (NOFA) criteria and
preferences.

Today's action improves the IHTF program to address the issues raised by community
stakeholders, including (1) increasing flexibility in the timing of awards, (2) prioritizing
projects near transit and low VMT areas, and (3) adding consideration for developments on
County-owned land.

Further, this action also allocates funds to support research, policy development, and piloting
new programs to develop comprehensive solutions to accelerate housing production.

In the near-term, this action moves $20 million into the IHTF to be used for financing
affordable housing projects. Based on the deployment and leverage results of prior IHTF
rounds, these funds could facilitate the development of approximately 400-600 affordable
housing units.

**EXHIBIT A**
**029**

However, the regional affordable housing need is massive at nearly 99,000 units and cannot be solved through incremental investments into existing programs alone. Over the past decade, the San Diego region has only produced enough affordable housing to meet 12% of the need, while the County has only met 18% of its Regional Housing Needs Assessment affordable housing targets.

The scale of the shortfall requires us to work broadly and boldly to develop new programs and policies that can tackle the enormity of our housing crisis and ensure that safe, affordable, and sustainable housing is available for all. Thus, today's action also recommends utilizing $5 million for transformative housing research, policy development, and piloting new programs and initiatives to develop comprehensive and systemic solutions that can accelerate housing production.

Today's action will align funding resources to address both immediate and longer-term housing priorities.

We urge our colleagues to join us in supporting these actions.

**RECOMMENDATION(S)**
**SUPERVISOR TERRA LAWSON-REMER AND SUPERVISOR JOEL ANDERSON**

1. Direct the Chief Administrative Officer to place $20 million of the funding previously allocated to support affordable housing into the Innovative Housing Trust Fund, which may be used to support affordable housing development and preservation.

2. Direct the Chief Administrative Officer to amend the Innovative Housing Trust Fund NOFA criteria and preferences to as follows:
   a. Increase the flexibility in the timing of awarding Innovative Housing Trust Fund awards to allow for County funds, in the Chief Administrative Officer or designee's discretion, to be committed to projects prior to securing State and federal funding.

   b. Address equity and environmental justice disparities by including a preference of Environmental Justice areas and Healthy Places Index (HPI) area with scores under 50%.

   c. Address sustainability and climate emergency by authorizing that there shall be a preference for affordable housing developments in low VMT areas as defined by SB 743; and for projects that include sustainable building materials and sustainable design principles, per LEED, EnergyStar, BREEM or an equivalent sustainability certification body.

   d. Authorize creation of a preference for projects on County-owned property, with the Chief Administrative Officer or designee determining whether and under what conditions to apply the preference in each NOFA.

3. Direct the Chief Administrative Officer to utilize $5 million already appropriated to affordable housing purposes for additional innovative and sustainable affordable housing policy research, affordable housing policy development, and implementation and evaluation of affordable housing pilot programs that advance equity, sustainability, and affordability.

**EXHIBIT A**
**030**

**EQUITY IMPACT STATEMENT**

Housing affordability and housing insecurity are key drivers of regional and statewide poverty rates. The high cost of housing impacts all San Diegans, but the burden falls disproportionately on low-income households and communities of color especially young families with children. Disparities in housing affordability, accessibility, and segregation are not incidental but directly linked to past and current discriminatory policies that have exacerbated racial and ethnic gaps in housing stability, homeownership, and intergenerational wealth. Inequalities across the housing market have also resulted in impediments to fair housing choice to many populations, including persons with disabilities, persons with HIV/AIDS, older adults, as well as LGBTQ+ individuals. Housing unaffordability is also a key driver of the regional homelessness crisis, which saw a sharp increase of people entering homelessness even before the COVID-19 epidemic.

**FISCAL IMPACT**

Funds for this request are already included in the Fiscal Year 2021-22 Operational Plan. Therefore, there is no additional fiscal impact from this board action. If approved, these requests will result in estimated costs and revenue of $25,000,000 in Fiscal Year 2021-22. This includes $20,000,000 for the support of affordable housing development and preservation to be deposited into the Innovative Housing Trust Fund and $5,000,000 for costs associated with housing research, policy development, and piloting new programs and initiatives to develop comprehensive and systemic solutions that can accelerate housing production. The funding source is the General Fund. There will be no change in net General Fund costs and no additional staff years.

**BUSINESS IMPACT STATEMENT**

These actions will positively impact the economic outlook and business climate across the San Diego region. High cost of living and housing cost burden are major barriers for businesses looking to attract and retain a highly skilled workforce. Each year, the County of San Diego loses a net total of 23,000 people, with the high cost of living as one of the driving factors. Further, households that are not housing cost burdened tend to have more disposable income to stimulate local economic activity. The regional economy also stands to gain from the spillover effects from the construction and renovation of affordable housing units. Research from the National Association of Home Builders estimates that a typical 100-unit affordable housing development leads to the creation of 80 construction jobs from direct and indirect effects, and another 42 jobs supported by induced spending throughout the region.

**ACTION:**

ON MOTION of Supervisor Lawson-Remer, seconded by Supervisor Fletcher, the Board of Supervisors took action as recommended.

AYES:        Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

**EXHIBIT A**
**031**

7.  **SUBJECT:  TRANSFORMATIVE HOUSING SOLUTIONS THAT ADVANCE EQUITY, SUSTAINABILITY, AND AFFORDABILITY FOR ALL (DISTRICTS: ALL)**

**OVERVIEW**

The San Diego region faces a severe housing crisis. Housing prices have far outpaced inflation and wage growth over the past decades, driving rents and home prices out of reach for many residents, forcing households to make serious trade-offs to live in the region, and contributing to a historic homelessness surge.

For decades, the housing policy discourse has failed to adequately address the scale of our housing shortfall. We are currently missing approximately 88,400 units across the region - or roughly 7% of the regional housing stock - and the vast most of the missing homes are needed for lower-income and middle-income households. We refer to this missing subset of the housing market as "equitable housing", which includes people with a diversity of housing needs: very low-income households making less than $50,000 per year, older adults living on fixed incomes, college students, single-parents, teachers, nurses, childcare workers, and middle-income families making up to 120% of area median income, or approximately $130,000 per year. We need more housing across the income spectrum and the need is by far the greatest for equitable housing.

What is "Equitable Housing"?

| Category | AMI Tier | AMI Range | Household Income |
|---|---|---|---|
| Equitable Housing | Very Low-Income | <50% AMI | < $54,550 |
| | Low-Income | 50-80% AMI | $54,551 - $87,300 |
| | Moderate-Income | 80-120% AMI | $87,301 - $130,950 |
| Market-rate housing | Above Moderate-Income | Over 120% AMI | $130,951 > |



The Region is Missing 88% of the Equitable Housing Units We Need

**EXHIBIT A**
**032**

How Much Equitable Housing Do We Need?

| Category | AMI Tier | AMI Range | Target Units | Permitted Units | Missing Units | % Shortfall |
|---|---|---|---|---|---|---|
| Equitable Housing | Very Low-Income | <50% AMI | 36,450 | 3,775 | 32,675 | 90% |
| | Low-Income | 50-80% AMI | 27,700 | 5,126 | 22,574 | 81% |
| | Moderate-Income | 80-120% AMI | 30,610 | 2,690 | 27,920 | 91% |
| Market Rate | Above Moderate-Income | >120% AMI | 67,220 | 61,987 | 5,233 | 8% |
| *Equitable Housing Subtotal* | | | *94,760* | *11,591* | *83,169* | *88%* |
| *Grand Total* | | | *161,980* | *73,578* | *88,402* | *55%* |

Source: Results from 5th Cycle RHNA (2010-2020), SANDAG

The current 6th Cycle Regional Housing Needs Assessment (RHNA) anticipates the need for 21,500 new housing units per year, but we are currently building at less than half that rate. In fact, we haven't seen that scale of production since 1988.

The high cost of housing impacts all San Diegans: low-income residents, retirees living on a fixed income, younger generations locked out of homeownership, and struggling families trying to stay in the County. The housing crisis also drags down the regional economy as attracting and retaining businesses and employees has become increasingly challenging due to the unsustainably high cost of living. Since 2011, the County of San Diego has seen a net loss in migration, with an average of 23,000 more people moving out of San Diego than moving in each year, and those leaving the region are largely being priced out, with median incomes averaging $50,000 per year, four times lower than new residents moving into the region.

Alarmingly, housing affordability has only worsened during the COVID-19 pandemic as median asking rents increased 8.4% year over year to $2,075 a month, while median home prices surged 18.7% - among the highest increase in the nation - to a record high of $800,000.

The pandemic has also made it clear that safe, decent, affordable housing is an essential form of infrastructure that is necessary for families and communities to thrive. As we lay the groundwork for a just and equitable recovery, we must center housing as a key investment to securing long-term stability, environmental sustainability, and economic resiliency across the region.

Today's action aims to start a frank, honest, and data-driven conversation about the scale of our regional housing crisis. This letter diagnosis four housing challenges facing our region and offers pathways for transformative housing solutions, including seven specific research and policy initiatives for County staff to investigate. These solutions have the potential to accelerate housing production and preservation and to advance equity, sustainability, and affordability for all.

**EXHIBIT A**
**033**

We urge our colleagues to join us in supporting this effort.

**RECOMMENDATION(S)**
**SUPERVISOR TERRA LAWSON-REMER AND VICE-CHAIR NORA VARGAS**

1. Direct the Chief Administrative Officer to research and evaluate the options for increasing "equitable housing" (ie. very low-income, low-income, and moderate-income housing) as described in Section 5: Principles to Orient Equitable Housing Solutions, and Section 6: Developing Transformative Housing Solutions, starting on page 14 on this letter. The Chief Administrative Officer is authorized to procure experienced and qualified consultants to assist and support the investigation of these options as needed.

2. Authorize the Director, Department of General Services in conjunction with existing as-needed consultants to perform a real estate market assessment of Sorrento Valley East and Sorrento Valley West to document general market trends and conditions for potential future acquisition and redevelopment along the transit corridor.

3. Direct the Chief Administrative Officer to develop a stakeholder outreach plan to inform the research and evaluation process. Stakeholders may include housing builders, architects, land use attorneys, lenders, tenant rights advocates, tenant legal services providers, researchers, environmental stakeholders, community-based advocates, LEED experts, philanthropic organizations, labor, local elected officials, city representatives, and impacted low-and-moderate income individuals.

4. In accordance with Section 401, Article XXIII of the County Administrative Code, authorize the Director, Department of Purchasing and Contracting, to amend existing contracts or issue competitive solicitations for consultant services necessary to implement the recommendations in this Board Letter, and upon successful negotiations and determination of a fair and reasonable price, award contracts for an Initial Term of up to one year, with four option years, and up to an additional six months, if needed; subject to the availability of funding, and to amend the contracts to reflect changes in program, funding or service requirements, subject to the availability of funds.

5. Report back to the Board with a memo detailing progress updates including, but not limited to, the following: progress on any consultant engagement efforts, progress on community and stakeholder engagement processes as well as any summarized feedback, initial research findings, policy recommendations, and deliverable timelines for each item contained in Section 6: Developing Transformative Housing Solutions by December 15, 2021, and quarterly thereafter.

6. Transfer appropriations of $1,068,000 from Housing and Community Development Services, Services & Supplies to Planning and Development Services, Salaries & Benefits ($173,000) and Services & Supplies ($895,000) for Fiscal Year 2021-22 staffing costs and one-time study costs as outlined below based on unassigned General Fund fund balance, and approve the request to add 1.00 staff years in Planning and Development Services.

**EXHIBIT A**
**034**

**EQUITY IMPACT STATEMENT**
Housing affordability and housing insecurity are key drivers of regional and statewide poverty rates. The high cost of housing impacts all San Diegans, but the burden falls disproportionately on low-income households and communities of color especially young families with children. Disparities in housing affordability, accessibility, and segregation are not incidental but directly linked to past and current discriminatory policies and practices that have exacerbated racial, ethnic, and generational gaps in housing stability, homeownership, and wealth. Inequalities across the housing market have also resulted in impediments to fair housing choice to many populations, including persons with disabilities, persons with HIV/AIDS, older adults, as well as LGBTQ+ individuals. Housing unaffordability is also a key driver of the regional homelessness crisis, which saw a sharp increase of people entering homelessness even before the COVID-19 epidemic.

**FISCAL IMPACT**
Funds for this request are included in the Fiscal Year (FY) 2021-22 Operational Plan for Housing and Community Development Services initially approved for the Innovative Housing Trust Fund (IHTF) and other innovative housing solutions in the FY 2021-22 Adopted Operational Plan. If approved, this request will result in costs of $200,000 in Housing and Community Development Services in the Health and Human Services Agency and costs $1,068,000 and one additional staff year in Planning and Development Services. The funding source is unassigned General Fund fund balance. Ongoing costs and funding sources will be included and identified in future Operational Plans.

**BUSINESS IMPACT STATEMENT**
This action will support the health and well-being of households across the region and promote sustainable economic development and regional economic competitiveness by advancing housing solutions that address housing cost burden and increase the availability of affordable and attainable housing. Further, households that are not housing cost-burdened tend to have more disposable income to stimulate local economic activity. The regional economy also stands to gain from the spillover effects from the construction and renovation of affordable housing units. Research from the National Association of Home Builders estimates that a typical 100-unit affordable housing development leads to the creation of 80 construction jobs from direct and indirect effects, and another 42 jobs supported by induced spending throughout the region.

**ACTION:**
ON MOTION of Supervisor Lawson-Remer, seconded by Supervisor Vargas, the Board of Supervisors took the following actions:
1. Directed the Chief Administrative Officer to research and evaluate the options for increasing "equitable housing" (ie. very low-income, low-income, and moderate-income housing) as described in Section 5: Principles to Orient Equitable Housing Solutions, and Section 6: Developing Transformative Housing Solutions, starting on page 14 on this letter. The Chief Administrative Officer is authorized to procure experienced and qualified consultants to assist and support the investigation of these options as needed.

**EXHIBIT A**
**035**

2.  Authorized the Director, Department of General Services in conjunction with existing as-needed consultants to perform a real estate market assessment of Sorrento Valley East and Sorrento Valley West to document general market trends and conditions for potential future acquisition and redevelopment along the transit corridor.
    a.  Direct the Chief Administrative Officer to determine if the Buena Creek Area meets the overall criteria, and if it does, conduct the analysis described.  If it does not, report back to the Board.

3.  Direct the Chief Administrative Officer to develop a stakeholder outreach plan to inform the research and evaluation process. Stakeholders may include housing builders, architects, land use attorneys, lenders, tenant rights advocates, tenant legal services providers, researchers, environmental stakeholders, community-based advocates, LEED experts, philanthropic organizations, labor, local elected officials, city representatives, impacted low-and-moderate income individuals, and, any group or organization that approaches the County of San Diego.

4.  In accordance with Section 401, Article XXIII of the County Administrative Code, authorize the Director, Department of Purchasing and Contracting, to amend existing contracts or  issue competitive solicitations for consultant services necessary to implement the recommendations in this Board Letter, and upon successful negotiations and determination of a fair and reasonable price, award contracts for an Initial Term of up to one year, with four option years, and up to an additional six months, if needed; subject to the availability of funding, and to amend the contracts to reflect changes in program, funding or service requirements, subject to the availability of funds.

5.  Report back to the Board with a memo detailing progress updates including, but not limited to, the following: progress on any consultant engagement efforts, progress on community and stakeholder engagement processes as well as any summarized feedback, initial research findings, policy recommendations, and deliverable timelines for each item contained in Section 6: Developing Transformative Housing Solutions by December 15, 2021, and quarterly thereafter.

6.  Transfer appropriations of $1,068,000 from Housing and Community Development Services, Services & Supplies to Planning and Development Services, Salaries & Benefits ($173,000) and Services & Supplies ($895,000) for Fiscal Year 2021-22 staffing costs and one-time study costs as outlined below based on unassigned General Fund fund balance, and approve the request to add 1.00 staff years in Planning and Development Services.

AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

8.   **SUBJECT:   AUTHORIZE COMPETITIVE SOLICITATION FOR AN ADMINISTRATOR FOR HOMELESS HOUSING AND SUPPORT TO SERVE PEOPLE WITH HIGH NEEDS EXPERIENCING HOMELESSNESS IN SAN DIEGO COUNTY (DISTRICTS: ALL)**

**OVERVIEW**
In 2017, the County of San Diego (County) received its first allocation of Housing and Disability Advocacy Program (HDAP) funding. HDAP offers housing related financial

assistance and wrap-around supportive services, including, but not limited to interim housing, rental assistance, housing navigation, case management, security deposits, utility payments, moving costs, legal services, and credit repair. Since 2017, HDAP combined with other funding sources has served high-needs populations and have allowed the contracted providers flexibility to secure housing for 594 individuals through hotel vouchers, rental assistance and deposits, landlord incentives, storage fees, and structural modifications for livability. On May 31, 2022, these provider contracts will end; as a result, the County seeks to secure an entity to continue administration of the current housing subsidies for eligible tenants, as well as the capacity to add new housing rental subsidies and provide housing related supports for eligible individuals. The provided housing interventions and supports will be determined by the individual/household's level of need, and may include housing navigation/locator, housing specific case management services, landlord and tenant supports, short-, mid- and long-term housing assistance. The housing assistance strategies could include bridge housing, master leasing, flat rental subsidies, shared housing, as well as other evidence-based housing solutions.

Over the last several years, the San Diego County Board of Supervisors (Board) has demonstrated its commitment to housing and supports to address the needs of people experiencing and at-risk of homelessness. Most recently, on April 6, 2021 (06) the Board called for the establishment of the Department of Homeless Solutions and Equitable Communities to provide regional leadership on homelessness. The intent of the new department is to achieve sustained focus on the complex and interconnected issue of homelessness and better coordination of existing and future homeless activities and progress. In alignment with previous actions and in order to continue to advance the Board's priorities, a homeless housing and support administrator is needed to serve persons experiencing homelessness.

Today's actions request the Board authorize the Director, Department of Purchasing and Contracting to issue a competitive solicitation for a homeless housing and support administrator. Additionally, today's action requests the Board authorize application for future funding opportunities related to addressing homelessness. These items align with the County's *Live Well San Diego* vision by creating an opportunity to further support the housing needs of vulnerable people and help them thrive to remain healthy and safe. In addition, this effort supports the Framework for Our Future which prioritizes communities and populations in San Diego that have been historically left behind.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**
1.  In accordance with Section 401, Article XXIII of the County Administrative Code, authorize the Director, Department of Purchasing and Contracting, to issue a competitive solicitation for a homeless housing and support administrator, and upon successful negotiations and determination of a fair and reasonable price, award a contract(s) for the period of up to one year and up to four option years, and up to an additional six months, if needed; and to amend the contract(s) to reflect changes in program, funding or service requirements, subject to the availability of funds and the approval of the Agency Director, Health and Human Services Agency.

**EXHIBIT A**
**037**

2. Authorize the Agency Director, Health and Human Services Agency, to apply for future funding opportunities related to addressing homelessness throughout the region in the current and future fiscal years, as they will provide overall value to the County by advancing efforts to reduce the number of people in the county who are at risk of or experiencing homelessness.

**EQUITY IMPACT STATEMENT**

Securing an administrator for homeless housing and supports will assist those who are homeless or at-risk of homelessness throughout San Diego County. It is anticipated that this action will provide needed housing and supports to residents who are disproportionality represented in the homeless system including justice involved individuals as well as Black, Indigenous and People of Color (BIPOC). In general, the incidence of Black, Native Americans and other persons of color experiencing homelessness mirrors the disparities found at the broader community levels. These group are over-represented in homelessness when compared with their proportion on the generalcommunity. Locally, Black people make up 5.5 percent of the general population with 28 percent represented in the homeless population, American Indian/Alaskan Native make up 1.3 percent of the population with 2.6 percent represented in the homeless population. In addition, Native Hawaiian or Other Pacific Islander make up .6 percent of the population with 1.5 percent represented in the homeless population. As a means to drive these funds to address these inequities, the following actions will occur: 1. data will be collected and evaluated to identify opportunities of impact and program improvement. The data collection will include comparing demographics of the general population to those served by the program; 2. data points will be identified to drive goals and foster equity; 3. geographic mapping will be developed to inform place-based investments and 4. qualitative data from focus groups will be tracked to evaluate for program improvement and successes.

**FISCAL IMPACT**

Funds for this request are included in the Fiscal Year 2021-23 Operational Plan in the Health and Human Services Agency (HHSA). If approved, this request will result in costs and revenue of approximately $1,330,000 in Fiscal Year 2021-22 and costs and revenue of approximately $2,014,000 in Fiscal Year 2022-23. The funding sources are existing allocations of State funding from housing funds for Whole Person Wellness and the Housing Disability Advocacy Program. There will be no change in net General Fund cost and no additional staff years.

**BUSINESS IMPACT STATEMENT**

N/A

**ACTION:**

ON MOTION of Supervisor Vargas, seconded by Supervisor Fletcher, the Board of Supervisors took action as recommended.

AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

**EXHIBIT A**
**038**

9.    **SUBJECT:    NOTICED PUBLIC HEARING:
GENERAL SERVICES - APPROVAL OF AMENDMENTS TO
DISPOSITION AND DEVELOPMENT AGREEMENTS AND GROUND
LEASES FOR AFFORDABLE HOUSING - 1501/1555 SIXTH AVENUE,
5255 MT. ETNA DRIVE, 6950 LEVANT STREET AND 1464
MONTECITO ROAD (DISTRICTS: 2 & 4)**

**OVERVIEW**

In recent years the timing and competitive nature of affordable housing funding sources has changed. There is more demand for Tax Exempt Bonds now than are available, and as a result they have become competitive for the first time in decades. Tax credits and bonds are the foundations for almost all affordable housing development in California. For a developer to achieve the highest competitive scoring for financing applications they must show sufficient investments by the local agency as well as acceptable terms in the Disposition and Development Agreement (DDA) and Ground Lease. The request today is for approval of amendments of the DDA and/or Ground Leases for 1501/1555 Sixth Avenue, 5255 Mt. Etna Drive and 6950 Levant Street in the City of San Diego and 1464 Montecito Road in Ramona, in order to create maximum financial feasibility for these affordable developments located on County-owned land. An overview of each request is as follows:

**1501/1555 Sixth Avenue**

On July 23, 2019 (11), the Board of Supervisors (Board) authorized the Director of the Department of General Services to execute a DDA and subsequent 99-year Ground Lease with BRIDGE Housing Corporation (BRIDGE) for a 100% affordable housing development located at 1501/1555 Sixth Avenue in the City of San Diego, consisting of approximately 60 senior units and approximately 60 family units. On September 8, 2019, the DDA was fully executed and became immediately effective. During the due diligence period, BRIDGE identified significant increases related to the demolition of the site that were previously unaccounted for and further described below (see Background). BRIDGE has requested an amendment to remove the upfront payment requirement and reduce annual payments in addition to an extension to the pre-construction phase. Elimination of these payments will reduce financial liabilities and improve scoring on financing applications.

**5255 Mt. Etna Drive**

On July 7, 2020 (11) the Board authorized the Director of the Department of General Services to execute a DDA and subsequent 99-year Ground Lease with Chelsea Investment Corporation (Chelsea) for a 100% affordable housing development located at 5255 Mt. Etna Drive in the City of San Diego, consisting of approximately 174 senior homes and approximately 230 family homes. On August 7, 2020, the DDA was fully executed and became immediately effective. Chelsea has requested an amendment to the DDA that will allow a four-phase project schedule, which will create better financial feasibility of the development. Chelsea has also requested elimination of the upfront payment and reduction of the annual payments, extension to the pre-construction phase, as well as amending the terms related to the total amount of parking.

**6950 Levant Street**

On September 11, 2018 (5), the Board accepted a feasibility study prepared by the San Diego Kind Corporation for a proposed affordable senior housing project located on a 4.1-acre County-owned property at 6950 Levant Street in the City of San Diego. On December 11, 2018 (18), the Board approved a Ground Lease managed by Wakeland Housing and

**EXHIBIT A**
**039**

Development Corporation (Wakeland) for the development of approximately 126 senior housing units on the site. The Ground Lease was executed on December 11, 2018. Wakeland has been awarded the majority of funding required to construct the project, including $19M of Multi-Family Housing Program (MHP) funds from California Housing and Community Development (HCDS). During the HCDS review process a compatibility issue with the funding requirements and the executed Ground Lease financial terms was identified. To receive these funds, Wakeland has requested an amendment to the Ground Lease which would amend the incompatible terms, in addition to an extension to the pre-construction phase of the project.

**1464 Montecito Road**
On June 2, 1981 (8), the Board approved a DDA and Ground Lease with G & S Properties (Reiner Communities) for the construction of the 70-unit apartment project on 4.5 acres of County-owned land in Ramona (Montecito Village Apartments). On August 5, 2008 (8), the Board approved a 1st Amendment to the Ground Lease extending the lease term and restructuring the rent provisions. Reiner Communities has requested a 2nd Amendment to extend the end of the lease term from the current date of 2064 to 2079, which will allow them to restructure debt at a lower rate and ensure their ability to fund critical capital needs and resident social services. In addition to this Amendment, County will record a Regulatory Agreement which, in accordance with Government Code section 25539.4, will extend the affordability covenants to match the lease term.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**
1. Find that the proposed actions are not subject to review under the California Environmental Quality Act (CEQA) pursuant to State CEQA Guidelines section 15060(c)(2) and 15060(c)(3) because they will not result in a direct or reasonably foreseeable indirect physical change to the environment and are not a project as defined in Section 15378(b)(5).

2. With respect to the authorization to execute an Amended and Restated Disposition and Development Agreement for the project at 5255 Mt. Etna Drive, find that the environmental impact report (EIR) dated January 14, 2020 on file with the Department of General Services as Environmental Impact Report (SCH No. 2018091016) was completed in compliance with CEQA and State CEQA Guidelines and that the Board of Supervisors has considered the information contained therein before approving the project; and find that there are no changes in the project or in the circumstances under which it is undertaken which involve significant new environmental impacts which were not considered in the previously certified EIR, and that there is no substantial increase in the severity of previously identified significant effects, and that no new information of substantial importance has become available since the EIR was certified as explained in the Environmental Review Update Checklist dated August 10, 2021.

3. Find that the Amended and Restated Disposition and Development Agreement for 5255 Mt. Etna Drive and the Disposition and Development Agreement for 1501/1555 Sixth Avenue, as amended by the First Amendment to Disposition and Development Agreement, will help meet the housing needs of the County and result in economic benefits to the County, and that the public benefit of leasing these properties is expected to be greater than the public benefit which would result from their sale.

4.  Adopt the following two Ordinances, which are attached as Attachment A and Attachment B, respectively, after holding a public hearing as required by California Government Code section 25515.2. **(4 VOTES)**
AN ORDINANCE AUTHORIZING AN AMENDMENT TO THE DISPOSITION AND DEVELOPMENT AGREEMENT BY AND BETWEEN THE COUNTY OF SAN DIEGO AND BRIDGE HOUSING CORPORATION OR ITS AFFILIATE FOR LEASE AND DEVELOPMENT OF THE REAL PROPERTY LOCATED AT 1501/1555 SIXTH AVENUE IN THE CITY OF SAN DIEGO

AN ORDINANCE AUTHORIZING AN AMENDED AND RESTATED DISPOSITION AND DEVELOPMENT AGREEMENT BY AND BETWEEN THE COUNTY OF SAN DIEGO AND CHELSEA INVESTMENT CORPORATION OR ITS AFFILIATE FOR LEASE AND DEVELOPMENT OF THE REAL PROPERTY LOCATED AT 5255 MT. ETNA DRIVE IN THE CITY OF SAN DIEGO

5.  Authorize the Clerk of the Board to publish the Ordinances in accordance with California Government Code section 25124.

6.  Authorize the Director, Department of General Services, to execute the First Amendment to Disposition and Development Agreement for 1501/1555 Sixth Avenue, the Amended and Restated Disposition and Development Agreement for 5255 Mt. Etna Drive, the First Amendment to Ground Lease for 6950 Levant Street, and the Second Amendment to Ground Lease for 1464 Montecito Road, and to execute the attachments to these amendments and the attachments to the amended original documents, and to take all actions necessary to implement these amendments and the amended original documents, including but not limited to, approving and executing amendments to these documents.

7.  Authorize the Agency Director, Health and Human Services Agency, or a designee, to execute the Regulatory Agreements attached to the Disposition and Development Agreements and Ground Leases, as amended by these actions, for 1501/1555 Sixth Avenue, 5255 Mt. Etna Drive, 6950 Levant Street, and 1464 Montecito Road (Regulatory Agreements), and to perform any actions in furtherance of or necessary to administer or implement the Disposition and Development Agreements and Ground Leases, as amended by these actions, for 1501/1555 Sixth Avenue, 5255 Mt. Etna Drive, 6950 Levant Street, and 1464 Montecito Road, including approving and executing amendments to the Regulatory Agreements.

**EQUITY IMPACT STATEMENT**
Today's requested recommendations will result in an amendment to the terms in the DDA's and Ground Lease's which will allow for greater financial feasibility to construct and or maintain much needed affordable homes in the region. Approval of the requested recommendations contribute to the County's efforts in addressing local housing shortages which will help to increase access to quality affordable housing.  Additionally, this will result in the creation of private sector jobs and economic opportunities in San Diego County.  It is anticipated that members of all equity seeking groups could benefit from the requested actions.

**EXHIBIT A**
**041**

**FISCAL IMPACT**
**1501/1555 Sixth Avenue**
If approved, this request would eliminate the initial rent payment of $500,000 at lease commencement and result in a loss of anticipated lease revenue of approximately $20,000 annually from a reduction in fixed annual payments. There will be no change in net General Fund cost and no additional staff years.

**5255 Mt. Etna Drive**
If approved, this request would eliminate the initial rent payment of $3,250,000 at lease commencement and establish a County Administrative Fee with annual payments of $5,000 per project, $20,000 total, with a 1% escalator, in addition to the land note payments sharing 50% of surplus cash on a pro-rata basis. The share of cash flow is anticipated to be nominal for the first 15 years beginning in 2023. There will be no change in net General Fund cost and no additional staff years.

**6950 Levant Street**
If approved, this request would convert percentage payments to fixed payments of $10,000 annually subject to a 1% annual escalation. There will be no change in net General Fund cost and no additional staff years.

**1464 Montecito Road**
If approved, this request would extend the end date of the Ground Lease to 2079 with no change in anticipated lease revenue. There will be no change in net General Fund cost and no additional staff years.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Fletcher, seconded by Supervisor Anderson, the Board of Supervisors closed the Hearing and took action as recommended, adopting Ordinance No. 10741 (N.S.), entitled: AN ORDINANCE AUTHORIZING AN AMENDMENT TO THE DISPOSITION AND DEVELOPMENT AGREEMENT AND GROUND LEASE BY AND BETWEEN THE COUNTY OF SAN DIEGO AND BRIDGE HOUSING CORPORATION OR ITS AFFILIATE FOR LEASE AND DEVELOPMENT OF THE REAL PROPERTY LOCATED AT 1501/1555 SIXTH AVENUE IN THE CITY OF SAN DIEGO; and, Ordinance No. 10742 (N.S.) entitled: AN ORDINANCE AUTHORIZING AN AMENDED AND RESTATED DISPOSITION AND DEVELOPMENT AGREEMENT AND GROUND LEASE BY AND BETWEEN THE COUNTY OF SAN DIEGO AND CHELSEA INVESTMENT CORPORATION OR ITS AFFILIATE FOR LEASE AND DEVELOPMENT OF THE REAL PROPERTY LOCATED AT 5255 MT ETNA DRIVE IN THE CITY OF SAN DIEGO.

AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

**EXHIBIT A**
**042**

10.   **SUBJECT:   FULL VETTING OF THE BENEFITS, POTENTIAL RATE PAYER COST INCREASES AND LIABILITIES ASSOCIATED WITH COMMUNITY CHOICE AGGREGATION (DISTRICTS: ALL)**

**OVERVIEW**

The County of San Diego is considering joining one of the two Community Choice Energy (CCE) programs currently operating in the San Diego region:  San Diego Community Power and the Clean Energy Alliance.  However, recent events related to the Western Community Energy bankruptcy, combined with unaccounted for cost factors related to long duration energy storage puts the Board of Supervisors in the position of being asked to make a decision based on incomplete information. Further, the County's unincorporated area residents, who are not as affluent on average as coastal residents, face far greater average summer temperatures than those cities already participating in San Diego's two CCEs.  And they are also more reliant on electricity for heating. To address these issues, this resolution directs staff to come back with an updated feasibility study that incorporates the unaccounted-for risk and cost factors of joining a CCE and identifies the differences that exist between San Diego County's unincorporated area residents and residents residing in incorporated cities and coastal areas.

To date, the Board and County staff have largely relied upon a detailed feasibility study conducted by EES Consulting, Inc. that was delivered to the Board of Supervisors on August 29, 2019. This study contains useful information, but like many other CCA studies conducted by other jurisdictions, it overlooks a critical cost driver necessary for reliable renewables-based energy. And it does not address the differenced in demographics and energy use profile that exists between resident in cities and coastal areas and San Diego unincorporated area residents.

This overlooked cost driver consists of billions of dollars of long duration energy storage systems (LDES) that will have to be built to meet our energy needs via renewables. Without investing billions of dollars to deploy LDES systems into the grid, meeting 100 percent of our energy needs via renewables such as solar and wind is not possible. A December 2020 study sponsored by Energy Action Fund found that meeting existing 2030 statewide goals for renewables will require an additional 2 to 11 GW of operational long duration energy storage (LDES) and that achieving 100 percent renewable energy for the state will require 45 to 55 GW of LDES. This represents 150 times the storage currently in operation and 12 times the storage planned to be built or in operation. The updated feasibility study needs to incorporate the impact this unaddressed cost will have on unincorporated area residents.

None of the long-term energy storage costs have been incorporated into San Diego County's feasibility analysis. Without these costs, the study cannot accurately estimate the costs to which unincorporated area resident may be subject. Further, while the feasibility study does give us a matrix of risks, it did not address the risk that resulted in Western Community Energy (Riverside County's CCA) going bankrupt. Neither does it explain why Marin Clean Energy's rates are 7 to 10 percent greater than those of PG&E, despite a similar feasibility study that had project cost saving of 1 to 14 percent versus those of PG&E. The updated feasibility needs to come back with the reasons for the discrepancy between promised saving and actual lack of savings.  This will also result in a more compete risk matrix.

**EXHIBIT A**
**043**

The current feasibility study does not take into account the differences in demographics and energy needs of unincorporated area residents and the residents in the San Diego County's two existing CCAs. The updated more complete feasibility study needs to address this data and analysis deficit.

Additionally, the existing feasibility study does not address the risks associated with partnering with a CCE that is dominated by San Diego City or joining a CCE that will be controlled by three coastal cities who regularly work together on other issues. Each of the CCE's governing structures puts San Diego's unincorporated area residents' energy future under the control of jurisdictions whose demographics and energy needs are on average significantly different than those of unincorporated area residents. Regardless of how well intentioned potential CCE partners may be, there is a chance that divergent interests between the more urban residents and more rural residents could result in energy policy that does not treat San Diego County's unincorporated area residents fairly.

More specifically, San Diego County's unincorporated area residents face significantly hotter summers while being more reliant on electricity to provide heating for colder nights and colder winters. The updated feasibility study needs to address this.

Finally, the feasibility study does not provide the Board of Supervisor with any guidance as how to go about extracting the County from a CCA should circumstances dictate doing so.

**RECOMMENDATION(S)**
**SUPERVISOR JOEL ANDERSON**
1. Direct the Chief Administrative Officer to go back to EES Consulting, Inc. or another consulting firm to get the feasibility study updated to include:
   a. Revised cost estimates that incorporate the impact on cost to ratepayer from the investment in long duration storage that will be required over the next two decades to achieve a grid that truly can deliver 100 percent of its energy from renewables.

   b. An updated risk and benefits analysis in the feasibility study that incorporates the significant demographic and energy need differences of San Diego unincorporated area residents from those of San Diego area residents living along the coast and in incorporated areas.

2. Direct the Chief Administrative Officer to have the updated feasibility study compare rates that California's CCEs in business for more than two years are charging, versus the rates of the incumbent public utility.

3. Direct the Chief Administrative Officer to have the updated feasibility include a section on an exit strategy for San Diego County from a CCA should circumstances arise that doing so makes sense for San Diego County's unincorporated area residents.

**EQUITY IMPACT STATEMENT**
San Diego County's unincorporated area residents rely upon the San Diego County Board of Supervisors to represent them much as residents living in cities rely upon their city council members to represent them. San Diego's unincorporated area includes some of county's most disadvantaged residents living in areas that have lower per capita incomes with much higher average temperatures than San Diego County's more coastal residents. Energy reliability can be a life and death matter for vulnerable residents living in areas of San Diego County that

**EXHIBIT A**
**044**

regularly experience life threatening temperatures.  Consequently, any policy that has the potential to substantially raise their utility bills and or impact reliability must be carefully and completely analyzed.

**FISCAL IMPACT**
The cost to incorporate the costs of long-duration energy storage into the existing feasibility study should be significantly less than the original cost. County staff will come back with those cost estimates.

**BUSINESS IMPACT STATEMENT**
Reliable, affordable energy is critical to ensuring that San Diego businesses can continue to compete and provide jobs. Significant energy cost increases will damage San Diego's economy, leading to job losses.

**ACTION:**
A motion was made by Supervisor Anderson, seconded by Supervisor Desmond, for the Board of Supervisors to take action as recommended.

AYES: Anderson, Desmond
NOES: Vargas, Lawson-Remer, Fletcher

(Motion failed due to lack of majority vote.)


**11.      SUBJECT:   AUTHORIZATION TO JOIN COMMUNITY CHOICE ENERGY JOINT POWERS AUTHORITY AND TAKE RELATED ACTIONS (DISTRICTS: ALL)**

**OVERVIEW**
Community Choice Energy (CCE) is an energy supply program that allows cities and counties to meet local energy needs by aggregating the buying power of individual customers within a defined area to secure alternative energy supplies. The pooling of purchasing power to buy or generate electricity gives customers the choice of where to purchase their power. Choice, competition and local control are the bedrock of CCE. Today, there are twenty-four CCEs operating throughout the State, serving more than eleven million customers, including two CCEs in San Diego County.

In 2019, the Board of Supervisors adopted an ordinance stating the County's intent to form or join a CCE. The Board also adopted five Guiding Principles setting County terms to join others in forming a Joint Powers Authority (JPA). On April 6, 2021, the Board adopted Revised Guiding Principles and directed staff to engage in discussions with the San Diego Community Power (SDCP) and Clean Energy Alliance (CEA) CCE JPAs and return to the Board with options for potential County participation in those CCE JPAs consistent with the Revised Guiding Principles. Since that time, staff engaged in discussions with both CCE JPAs and worked with a consultant to evaluate County's options for joining one of the JPAs. The results of these efforts are summarized below.

**EXHIBIT A**
**045**

Today's action would authorize the County's membership in either the SDCP or CEA JPA, make related CEQA findings, authorize execution of the Joint Powers Agreement of the selected CCE, appoint Supervisors as the County's Director and Alternate Director for the selected JPA Board of Directors, and authorize any payments that may be necessary once a CCE JPA is selected.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**
1. Find that the proposed actions are not a project under the California Environmental Quality Act (CEQA) and are exempt from CEQA pursuant to CEQA Guidelines 15378(b)(5), 15060(c)(2), (3), 15061(b)(3), and direct the Department of General Services to file a Notice of Exemption as authorized by CEQA and state CEQA Guidelines.

2. Authorize the Chief Administrative Officer, or designee, to either:
    a. Execute the Clean Energy Alliance Joint Powers Agreement, in substantially the form attached as Attachment B (CEA JPA), and to take all actions necessary to establish County membership in the Clean Energy Alliance Joint Powers Authority; or

    b. Execute the San Diego Community Power Joint Powers Agreement, in substantially the form attached as Attachment C (SDCP JPA), and to take all actions necessary to establish County membership in the San Diego Community Power Joint Powers Authority.

3. Appoint one Supervisor as the Primary Director and one Supervisor as the Alternate Director to represent the County on the Board of Directors of the selected Joint Powers Authority.

**EQUITY IMPACT STATEMENT**
The pooling of purchasing power to buy or generate electricity gives customers the choice of where to purchase their power. Authorization to join a CCE could benefit county residents with competitive utility rates and cost savings compared to the current utility company, as well as provide local control and more renewable power. County staff conducted a series of five public meetings throughout the unincorporated county to gather public input on a possible County CCE. Overall, public comment was highly supportive of County participation in a CCE. It is expected that members of all equity-seeking groups could benefit from today's requested action.

**FISCAL IMPACT**
Funds for this request are included in the Fiscal Year 2021-22 Operational Plan for the Finance and General Government Office Executive Office. If approved, this request will result in costs and revenue of up to approximately $80,000 if the CEA JPA (recommendation 2a) is selected or $0 if the SDCP JPA (recommendation 2b) is selected. The funding source is unassigned General Fund Fund Balance. There will be no change in net General Fund cost and no additional staff years.

**BUSINESS IMPACT STATEMENT**
N/A

**EXHIBIT A**
**046**

**ACTION:**

ON MOTION of Supervisor Fletcher, seconded by Supervisor Vargas, the Board of Supervisors took the following actions:

1.   Found that the proposed actions are not a project under the California Environmental Quality Act (CEQA) and are exempt from CEQA pursuant to CEQA Guidelines 15378(b)(5), 15060(c)(2), (3), 15061(b)(3), and directed the Department of General Services to file a Notice of Exemption as authorized by CEQA and state CEQA Guidelines.

2.   Authorized the Chief Administrative Officer or designee to: execute the San Diego Community Power Joint Powers Agreement, in substantially the form attached as Attachment C (SDCP JPA), and to take all actions necessary to establish County membership in the San Diego Community Power Joint Powers Authority.

3.   Appointed Supervisor Lawson-Remer as the Primary Director and Supervisor Nora Vargas as the Alternate Director to represent the County on the Board of Directors of the selected Joint Powers Authority.

AYES:          Vargas, Lawson-Remer, Fletcher
NOES:          Anderson, Desmond


**12.   SUBJECT:   NEIGHBORHOOD REINVESTMENT PROGRAM GRANT (DISTRICT: 4)**

**OVERVIEW**

The County of San Diego is fortunate to have an opportunity to reinvest taxpayer money into our communities for the benefit of the public. This action will assist the County in meetings the needs of the community.

**RECOMMENDATION(S)**
**CHAIR NATHAN FLETCHER**

1.   Allocate $5,000 from the Neighborhood Reinvestment Program budget (Org 15665), Other Charges, to the County of San Diego Department of Parks and Recreation to sponsor the San Diego Nights Chess Tournament

2.   Transfer appropriations of $5,000 from the Neighborhood Reinvestment Program budget (Org 15665), Other Charges, to the County Department of Parks and Recreation to sponsor the San Diego Nights Chess Tournament.

3.   Find that the grant award described above has a public purpose.

4.   Authorize the Deputy Chief Administrative Officer/Chief Financial Officer to execute a grant agreement or amendments to the existing agreement with the organization awarded Neighborhood Reinvestment Program funds, establishing terms for receipt of the funds described above, and to make minor amendments to the agreement that are consistent with the general purpose of the grant but do not increase the grant.

**EXHIBIT A**
**047**

**EQUITY IMPACT STATEMENT**
We recognize that the systemic impacts that inequitable policies may create for residents in San Diego County. The proposed allocation of funds is intended to improve the quality of life throughout the County by providing funds to a nonprofit whose work addresses inequities by providing services to all throughout the county. Organizations are chosen for funding based on their location or the demographics they serve with a focus on underserved communities that contain higher numbers of People of Color and LGBTQ+ people. Organizations chosen should work to promote a sense of belonging and utilize equity in their operations, outreach, and programs. Supporting documents were reviewed as well as impact reports and community testimony to verify the organization meets these goals.

**FISCAL IMPACT**
The fiscal impact of these recommendations is $5,000 from the Neighborhood Reinvestment Program budget (Org 15665). Funds for these requests are included in the Fiscal Year 2020-21 Operational Plan for the Neighborhood Reinvestment Program (Org 15665). The funding source is General Purpose Revenue. These actions will not result in the addition of staff years or other costs.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Fletcher, seconded by Supervisor Vargas, the Board of Supervisors took action as recommended.

AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

13.     **SUBJECT:   COMMUNITY ENHANCEMENT PROGRAM GRANTS (DISTRICT: 3)**

**OVERVIEW**
The County of San Diego is fortunate to have an opportunity to reinvest taxpayer money into ourcommunities for the benefit of the public. This action will assist the County in meeting the needsof the community.

**RECOMMENDATION(S)**
**SUPERVISOR TERRA LAWSON-REMER**
1.   Allocate $25,000 from the Community Enhancement Program budget (Org 12900) to Jacob & Cushman San Diego Food Bank to support the San Diego's Blues Festival by paying the cost of musicians, advertisement, stage, sound and lighting equipment.

2.   Allocate $25,000 from the Community Enhancement Program budget (Org 12900) to North San Diego Business Chamber to cover the cost of rental, security, portable restrooms, cleaning services, street signs, AV marketing, photographer, pre-packaged meals, water, coffee, centerpieces and offset salaries for SD Women's Week, Economic Development Program, RB Alive, San Diego Business Summit and Honoring our Region's Heroes event.

3.   Find that the grants have a public purpose.

**EXHIBIT A**
**048**

4.  Authorize the Deputy Chief Administrative Officer/Chief Financial Officer to execute grant agreements or amendments to agreements with the organizations awarded grants establishing terms for receipt of the funds described above and to make minor amendments to the agreements that are consistent with the general purpose of the grants but do not increase the grants.

**EQUITY IMPACT STATEMENT**
We recognize the systemic impacts that inequitable policies may create for residents in San Diego County. These proposed allocations of funds are intended to improve the quality of life and economic conditions throughout the County by providing funds for nonprofits whose work addresses inequities, promotes qualify of life and improves outcomes that align with the vision of our county. Organizations were chosen based on their location or the demographics they serve with a focus on organizations that focus on vulnerable community members, and economic development. The organizations that were chosen work to promote a sense of belonging and utilize equity in their operations, outreach and programs. Their supporting documents were reviewed as well as impact reports and community testimony.

**FISCAL IMPACT**
The fiscal impact of these recommendations is $50,000 from the Community Enhancement Program budget (Org 12900). Funds for these requests are included in the Fiscal Year 2021-22 Operational Plan for the Community Enhancement Program (Org 12900). The funding source is Transient Occupancy Tax Revenues. These actions will not result in the addition of staff years or other costs.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Fletcher, seconded by Supervisor Vargas, the Board of Supervisors took action as recommended.

AYES:        Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

14.    SUBJECT:    **RECEIVE THE REPORT BACK ON THE SCOPE, ROLES AND RESPONSIBILITIES, INCLUDING THE NUMBER OF STAFF AND TYPE OF POSITIONS FOR INITIAL EXECUTION OF THE DUTIES FOR THE OFFICE OF LABOR STANDARDS AND ENFORCEMENT (DISTRICTS: ALL)**

**OVERVIEW**
On May 4, 2021 (23), your Board of Supervisors approved the creation of the Office of Labor Standards and Enforcement ("OLSE") to serve as a central location for education and resources for employers and their workers, undertake research and data analysis regarding worker issues, and pursue additional enforcement measures to protect workers. The OLSE is an external facing resource for workers not within County employment and their employers. The Board directed the Chief Administrative Officer to return with the overall scope, roles, and responsibilities of OLSE, including the number of staff and position types needed for initial implementation of the following duties:

**EXHIBIT A**
**049**

- Providing a central location for questions and connection to resources for workers across San Diego County;

- Engaging business and community partners in education and outreach on important issues related to workers;

- Acting as the County expert on worker issues, including data collection and research initiatives, to better understand regional workplace issues, including trends, gaps in services, and potential policies that would further goals of protecting and advancing fair and safe workplaces for all;

- Reporting back annually on the research and data analysis with policy recommendations to consider;

- Explore the creation of a workplace justice fund that could provide resources to workers who are seeking justice on workplace issues and need assistance;

- Determine additional avenues the County can participate in enforcement of state and local laws and regulations impacting workers; and,

- Coordinating with other County departments and offices that monitor and enforce County contracting requirements and expenditure of funds.

Today's action requests the Board receive the report on the scope, roles, and responsibilities, including the framework plan for the OLSE.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**
Receive the report on the overall scope, roles, and responsibilities of, including the number of staff and type of positions for initial execution of the duties for the OLSE.

**EQUITY IMPACT STATEMENT**
The County recognizes the essential role of sustainable, equitable and inclusive economic development in providing for a healthy regional economy.  The County strives to unlock the full potential of the local economy by dismantling barriers and expanding opportunities for low-income people and communities of color. Based on a study by the Economic Policy Institute, prior to the pandemic, minimum wage violations amounted to an estimated $2 billion of stolen wages from workers. A 2019 survey by the Center for Policy Initiatives and San Diego State University found that 64% of surveyed hourly workers experienced violations of sick day laws. These hourly employees did not receive sick days, received fewer than they were entitled, or faced retaliation when taking sick days. The COVID-19 pandemic has disproportionately impacted communities of color, based on County data. These workers are concentrated in tourism, hospitality, agriculture, and service sectors, which tend to have lower wages and are vulnerable to employers acting improperly. The OLSE will be providing education and resources to employers and workers and will be playing a role in enforcing laws and regulations within the County's jurisdiction. This would provide a local resource for workers to help achieve justice as well as a resource for good faith employers competing with businesses who do not abide by labor standards. The OLSE will provide workers who have been historically exploited the tools and resources to build stability for themselves and their families, which is an important step in addressing income inequality in communities of color.

**EXHIBIT A**
**050**

**FISCAL IMPACT**

Funds for this request are included in the Fiscal Year 2021-23 Operational Plan in the Chief Administrative Office. If approved, this request will result in costs and revenue of $1,100,000 in Fiscal Year 2021-22 and costs and revenue of $1,100,000 in Fiscal Year 2022-23. The funding source is General Fund fund balance. Future ongoing funding for the newly established Office of Labor Standards and Enforcement will be reviewed for potential funding from program revenue or General Purpose Revenue in future Operational Plans. There will be no change in net General Fund cost and no additional staff years.

**BUSINESS IMPACT STATEMENT**

The OLSE will be a resource for workers and their employers, so they may obtain information regarding applicable labor standards. In addition, the Office of Labor Standards will be taking steps to ensure workers are treated fairly, employers abiding by the rules are not put at a disadvantage by those cheating the system, and employers violating labor standards are held accountable.

**ACTION:**

ON MOTION of Supervisor Fletcher, seconded by Supervisor Vargas, the Board of Supervisors took action as recommended.

AYES:        Vargas, Anderson, Lawson-Remer, Fletcher
NOES:        Desmond

15.      **SUBJECT:    ADVANCING FEDERAL ADVOCACY EFFORTS (DISTRICTS: ALL)**

**OVERVIEW**

On January 26, 2021(14), the Board authorized a revised 2021 Legislative Program that includes focused and succinct guiding principles and key legislative initiatives and priorities which set the County on a new course of advocacy. This Board also directed the CAO to review and calibrate the roles and responsibilities of the Office of Strategy and Intergovernmental Affairs staff and functions according to the new legislative program to focus on proactive action and nimble advocacy of the adopted guiding principles and legislative priorities. Building on that direction, and in response to recent federal actions, it has become clear that the County would greatly benefit from having staff based in Washington, D.C. and co-located with the National Association of Counties (NACo).

The changing dynamics in Washington, D.C. over the first few months of the Biden Administration has provided fiscal and policy opportunities that greatly benefit the County of San Diego, with more opportunities on the horizon. Combined with our new, flexible Legislative Program that has allowed the County to engage for the first time proactively in a broad array of legislative opportunities, it is the right time to build momentum on the ground in Washington, D.C. Replicating a model adopted by Miami-Dade County, co-locating a staff member with NACo provides real-time and face-to-face access to the county-focused advocacy NACo provides as well as close proximity to Capitol Hill and our delegation's D.C. offices.

**EXHIBIT A**
**051**

Today's action would add a staff member to the Office of Strategy and Intergovernmental Affairs to be based in Washington, D.C. in the offices of NACo, and be responsible for focused efforts on advancing the Board's Legislative Program on all federal advocacy efforts.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**
1. Approve the request to add one staff year(s) to support the Office of Strategy and Intergovernmental Affairs, take appropriate administrative actions to on-board, and direct the Department of Human Resources to classify the position at the appropriate level.

2. Authorize the Director of the Department of General Services, and upon successful negotiations, enter into a lease or license, and any other necessary agreement(s), with the National Association of Counties for office space and associated support services for one County employee for an initial term of up to five years with five one-year options.

3. Transfer appropriations of $270,000 from the Finance and General Government Group Executive Office, Service and Supplies to the Chief Administrative Office, Salaries & Benefits ($245,000) and Services & Supplies ($25,000) in support of the addition of one staff year.

**EQUITY IMPACT STATEMENT**
The County of San Diego has had items on two Board agendas this year to address crafting a Legislative Program that meets the needs of the entire region. This includes adding to the legislative priorities an Equity and Justice section as well as creating Guiding Principles to advocate for legislation that ensures equity, transparency, and access for all residents. By advancing these efforts through legislative advocacy at the federal level, we are ensuring policy change and financial resources for programs and services that benefit and uplift the residents we serve.

**FISCAL IMPACT**
Funds for this request are included in the Fiscal Year 2021-2022 Operational Plan in the Finance and General Government Group Executive Office. If approved, this request will result in estimated current year costs of $270,000 based on unassigned General Fund fund balance, and similar ongoing annual costs in subsequent years based on General Purpose Revenue. There will be an increase in net General Fund cost and an increase of one staff year.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Fletcher, seconded by Supervisor Vargas, the Board of Supervisors took action as recommended.

AYES:          Vargas, Anderson, Fletcher, Desmond
ABSENT:      Lawson-Remer

**EXHIBIT A**
**052**

16.   **SUBJECT:   AMENDMENTS TO THE COMPENSATION ORDINANCE AND ADMINISTRATIVE CODE (8/31/2021 - FIRST READING; 9/14/2021 – SECOND READING) (DISTRICTS: ALL)**

**OVERVIEW**

The proposed amendments to the San Diego County Compensation Ordinance are part of the ongoing efforts to manage and maintain a skilled, adaptable and diverse workforce dedicated to sustaining operational excellence and serving the public. This action amends the Compensation Ordinance by 1) establishing the Housing Navigator classification in the Classified Service; 2) establishing Director, Office of Environmental and Climate Justice, Director, Office of Immigrant and Refugee Affairs, and Chief Evaluation Officer in the Unclassified Service; 3) amending the salary range for Director, Fire Authority; 4) changing class characteristics for Chief Medical Officer; 5) retitling three positions, (1) Director, Fire Authority to Director, County Fire, (2) Chief Operations Officer, Public Safety Group to Chief Operations Officer, and (3) Director, Office of Ethics and Compliance to Director, Office of Ethics, Compliance and Labor Standards; and 6) amending Section 6.1.1 of the Compensation Ordinance, which increases the number of authorized positions.

Today's recommendations also amend the Administrative Code by adding Section 125.4, and amending Sections 122, 125, 125.2, 494, and 496 to reflect these organizational and classification changes.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**

1.   Approve the introduction of the Ordinances (first reading):
     AN ORDINANCE AMENDING THE COMPENSATION ORDINANCE AND ESTABLISHING COMPENSATION.

     AN ORDINANCE AMENDING THE ADMINISTRATIVE CODE.

2.   If, on August 31, 2021, the Board takes action as recommended in item 1 then, on September 14, 2021 (second reading):
     Submit ordinances for further Board consideration and adoption on September 14, 2021 (second reading).

**EQUITY IMPACT STATEMENT**

Today's recommendations will improve the County's enterprise-wide strategy to evaluate programs that enable the Board of Supervisors and County leadership team to make evidence-based policy decisions that are most in line with the County's priorities, promote economic justice, combat wage theft, and ensure fair and equitable treatment of San Diego workers by enforcing and administering state and federal labor laws, enhance existing refugee programs and County resources for the immigrant population regardless of immigration status, and provide support and coordination across County groups.

Today's recommendations will also enhance services and develop programs to address the immediate needs of the homeless population, expand the administration of fire protection and emergency medical services, in addition to furthering environmental and climate justice programs and priorities for communities disproportionately impacted by air quality environmental burdens and related health problems, while also addressing reduction of greenhouse gasses and food justice and transportation equity for the benefit of the community.

**EXHIBIT A**
**053**

These actions are aligned to the County's 2021-2026 Strategic Plan and its vision for a San Diego that is Building Better Health, Living Safely, and Thriving.

**FISCAL IMPACT**
There is no fiscal impact associated with these recommendations. There will be no change in net General Fund cost and no additional staff years.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Fletcher, seconded by Supervisor Desmond, the Board of Supervisors took action as recommended, to further consider and adopt the Ordinances on September 14, 2021.

AYES:          Vargas, Lawson-Remer, Fletcher, Desmond
NOES:          Anderson

17.      **SUBJECT:    APPOINTMENTS: VARIOUS (DISTRICTS: ALL)**

**OVERVIEW**
These appointments are in accordance with applicable Board Policy A-74, "Citizen Participation in County Boards, Commissions and Committees."

**RECOMMENDATION(S)**
**SUPERVISOR JOEL ANDERSON**
Appoint Aimee Zeitz to the CHILD AND FAMILY STRENGTHENING ADVISORY BOARD OF SAN DIEGO, Seat No. 3, for a term to expire January 6, 2025.

Appoint Nicole Honstead to the SAN DIEGO COUNTY PARKS ADVISORY COMMITTEE, Seat No. 3, for a term to expire January 6, 2025.

Re-appoint Roy Castetter to the SAN DIEGO COUNTY CAPITAL ASSET LEASING CORP (SANCAL), Seat No. 2, for a term to expire January 6, 2025.

**SUPERVISOR JIM DESMOND**
Re-appoint Victoria Stover to the I-15 CORRIDOR DESIGN REVIEW BOARD, Seat No. 5, for a term to expire March 26, 2023.

**CHIEF ADMINISTRATIVE OFFICER**
Appoint Adeem Ismaeil to the LEON L. WILLIAMS SAN DIEGO COUNTY HUMAN RELATIONS COMMISSION, Seat No. 5, for an indefinite term.

Re-appoint Linda Latimer to the PAST GRAND JURORS ASSOCIATION IMPLEMENTATION REVIEW COMMITTEE, Seat No. 1, for a term to begin January 1, 2022 and expire December 31, 2023.

**EXHIBIT A**
**054**

Re-appoint Michael V. Barry to the PAST GRAND JURORS ASSOCIATION IMPLEMENTATION REVIEW COMMITTEE, Seat No. 2, for a term to begin January 1, 2022 and expire December 31, 2023.

Re-appoint Lixya Preston de Silva to the PAST GRAND JURORS ASSOCIATION IMPLEMENTATION REVIEW COMMITTEE, Seat No. 3, for a term to expire December 31, 2022.

Re-appoint Melvyn Stein to the PAST GRAND JURORS ASSOCIATION IMPLEMENTATION REVIEW COMMITTEE, Seat No. 4, for a term to begin January 1, 2022 and expire December 31, 2023.

Re-appoint Raymond R. Kruszona to the PAST GRAND JURORS ASSOCIATION IMPLEMENTATION REVIEW COMMITTEE, Seat No. 6, for a term to expire December 31, 2022.

**EQUITY IMPACT STATEMENT**
County government includes standing and special citizen boards, commissions, committees and task forces formed to advise the Board of Supervisors and County staff on issues and policy and to serve as links to the community.  Boards, commissions and committees provide an inter-relationship between the residents and the government of the County.  The nominations in this Board Letter enable the County of San Diego to provide individual residents the opportunity to impart valuable insight and input into the operation of the government.

**FISCAL IMPACT**
N/A

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Anderson, seconded by Supervisor Desmond, the Board of Supervisors took action as recommended, on Consent.

AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

18.     **SUBJECT:    COMMUNICATIONS RECEIVED (DISTRICTS: ALL)**

**OVERVIEW**
Board Policy A-72, Board of Supervisors Agenda and Related Process, authorizes the Clerk of the Board to prepare a Communications Received for Board of Supervisors' Official Records. Routine informational reports, which need to be brought to the attention of the Board of Supervisors yet not requiring action, are listed on this document.  Communications Received documents are on file in the Office of the Clerk of the Board.

**RECOMMENDATION(S)**
**CHIEF ADMINISTRATIVE OFFICER**
Note and file.

**EXHIBIT A**
**055**

**EQUITY IMPACT STATEMENT**
N/A

**FISCAL IMPACT**
N/A

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Anderson, seconded by Supervisor Desmond, the Board of Supervisors took action as recommended, on Consent.

AYES:          Vargas, Anderson, Lawson-Remer, Fletcher, Desmond

19.      **SUBJECT:     FRAMEWORK FOR OUR FUTURE: DECLARING HEALTH MISINFORMATION A PUBLIC HEALTH CRISIS (DISTRICTS: ALL)**

**OVERVIEW**
The resurging pandemic has led to more infections and hospitalizations than the region has seen since the beginning of the year and ICU capacity is once again being tested. The U.S. Surgeon General has recently warned that health misinformation presents an urgent threat to public health. Therefore, urgent action is needed to curb the spread of the Delta variant by combatting misinformation, thereby supporting our health care system and, in turn, saving lives. There would be a substantial detrimental effect on the County and public if not acted upon immediately. For these reasons, this Board Letter requires immediate action at the next Board meeting.

This Board Letter declares health misinformation to be a public health crisis. At a pivotal time in our history, with an FDA-approved vaccine available to all San Diegans free of charge and booster shots recommended later this year, health misinformation now presents a greater threat to public health than a variant of COVID-19. In response, the Board of Supervisors of the County of San Diego recognizes the vaccine hesitancy, that stands in the way of the County moving beyond the COVID-19 pandemic, is being fueled by the spread of health misinformation, and commits to developing strategies to actively combat health misinformation.

Following the recommendations of the U.S. Surgeon General Vivek H. Murthy in his advisory entitled "Confronting Health Misinformation," this board letter acknowledges the role misinformation has had in the resurgence of COVID-19 infections, once again filling hospital capacity, and driving the deaths and hospitalizations of thousands, including San Diegans and committing County resources to work with trusted stakeholders to aggressively counter misinformation in our community and engage in outreach based on best practices.

We strongly urge your support for the recommendations in this letter to recognize health misinformation as the threat to public health that it is, and take the necessary steps towards a stronger, healthier future.

**EXHIBIT A**
**056**

**RECOMMENDATION(S)**
**CHAIR NATHAN FLETCHER**

1. Approve resolution titled "Resolution of the Board of Supervisors of the County of San Diego Declaring Health Misinformation a Public Health Crisis."

2. Direct the Chief Administrative Officer (CAO) to implement the following strategies cited by the U.S. Surgeon General Vivek H. Murthy in his advisory entitled "Confronting Health Misinformation," and report back within 90 days on the status of implementation and within 180 days upon completion:

   a. Devote resources to identify and label health misinformation and disseminate timely health information to counter misinformation that is impeding our ability to keep our community safe,

   b. Modernize public health communications with investments to better understand gaps in health information, and questions and concerns of the community, especially in hard-to-reach communities. Develop targeted community engagement strategies, including partnerships with trusted messengers,

   c. Expand our research efforts to better define and understand the sources of health misinformation, document and trace its costs and negative impacts, and develop strategies to address and counter it across mediums and diverse communities,

   d. Invest in resilience against health misinformation including digital resources and training for health practitioners and health workers. Explore educational programs to help our communities distinguish evidence-based information from opinion and personal stories.

   e. Partner with federal, state, territorial, tribal, private, nonprofit, research, and other local entities to identify best practices to stop the spread of health misinformation and develop and implement coordinated recommendations.

   f. Identify resource gaps to combating health misinformation and working with state and federal partners to meet ongoing needs.

   g. Work with the medical community and local partners to develop a website that will serve as a central resource for combating health misinformation in our community.

**EQUITY IMPACT STATEMENT**

The COVID-19 pandemic has had a significant impact on the lives of individuals, businesses, and communities across San Diego County. Recent studies have found that online misinformation campaigns are associated with a decrease in vaccinations over time, which impacts all communities' ability to reach herd immunity. But, the impacts are greater in ethnic minority communities as a majority of non-white adults were found to be hesitant to receive the Covid-19 vaccine. Studies have found vaccine and healthcare distrust continue to serve as major barriers to addressing racial equity in Covid-19 vaccine efforts. It is believed that developing sustainable and sound strategies to mitigate and combat misinformation, such through the actions proposed in this Board action, is crucial to closing health outcomes gaps within Black and Hispanic communities and achieving overall public health goals.

TUESDAY, AUGUST 31, 2021                                                                                     40

**EXHIBIT A**
**057**

**FISCAL IMPACT**
There is no fiscal impact associated with this action. There may be future fiscal impacts associated with final recommendations which would need to be approved by the Board.

**BUSINESS IMPACT STATEMENT**
N/A

**ACTION:**
ON MOTION of Supervisor Fletcher, seconded by Supervisor Vargas, the Board of Supervisors took action as recommended, adopting Resolution No. 21-142, entitled: A RESOLUTION OF THE BOARD OF SUPERVISORS OF THE COUNTY OF SAN DIEGO DECLARING HEALTH MISINFORMATION A PUBLIC HEALTH CRISIS.

      AYES:          Vargas, Lawson-Remer, Fletcher
      NOES:          Anderson, Desmond

20.      **SUBJECT:    CLOSED SESSION (DISTRICTS: ALL)**

**OVERVIEW**
A.    CONFERENCE WITH LEGAL COUNSEL - EXISTING LITIGATION
      (Paragraph (1) of subdivision (d) of Section 54956.9)
      San Diego County Office of Education, et al. v. County of San Diego, et al.;
      Sacramento Superior Court, Case No. 34-2017-80002701-CU-WM-GDS

B.    CONFERENCE WITH LEGAL COUNSEL - ANTICIPATED LITIGATION
      Initiation of litigation pursuant to paragraph 4 of subdivision (d) of Government Code
      section 54956.9: (Number of Cases - 1)

C.    CONFERENCE WITH LEGAL COUNSEL - EXISTING LITIGATION
      (Paragraph (1) of subdivision (d) of Section 54956.9)
      K.J.P., et al. v. County of San Diego, et al.; United States District Court, Southern
      District No. 3:15-cv-02692-H.MDD

D.    CONFERENCE WITH LEGAL COUNSEL - EXISTING LITIGATION
      (Paragraph (1) of subdivision (d) of Section 54956.9)
      D.W., a minor, et al. v. County of San Diego, et al.; San Diego Superior Court,
      Case No. 37-2019-00029602-CU-PO-NC

E.    CONFERENCE WITH LEGAL COUNSEL - EXISTING LITIGATION
      (Paragraph (1) of subdivision (d) of Section 54956.9)
      Deborah Hooper v. County of San Diego, et al.; United States District Court,
      Southern District No. 3:07-cv-01647-JAH-KSC

F.    CONFERENCE WITH LEGAL COUNSEL - EXISTING LITIGATION
      (Paragraph (1) of subdivision (d) of Section 54956.9)
      Citizens for a Friendly Airport v. City of Carlsbad, et al.; San Diego Superior Court,
      Case No. 37-2019-00028690-CU-TT-CTL

G.   CONFERENCE WITH LEGAL COUNSEL - EXISTING LITIGATION
(Paragraph (1) of subdivision (d) of Section 54956.9)
Travelers Casualty Insurance Company of America v. The City of Oceanside, et al.;
San Diego Superior Court, Case No. 37-2021-00017609-CU-PO-NC

H.   CONFERENCE WITH LEGAL COUNSEL - EXISTING LITIGATION
(Paragraph (1) of subdivision (d) of Section 54956.9)
Cleveland National Forest Foundation, et al. v. County of San Diego, et al;
San Diego Superior Court, Case No. 37-2020-00031320-CU-WM-CTL

I.   CONFERENCE WITH LABOR NEGOTIATORS
(Government Code section 54957.6)
Designated Representatives:  Susan Brazeau, Brad Rankin
Employee Organizations and Unrepresented Employees:  All

**ACTION:**
Closed Session matters were continued to the Board of Supervisors session of September 1, 2021.

21.   **SUBJECT:   PUBLIC COMMUNICATION (DISTRICTS: ALL)**

**OVERVIEW**
Amy Reichert spoke to the Board regarding COVID-19.

Mike Borrello spoke to the Board regarding COVID-19 vaccines.

Louis Uridel and Jessie spoke to the Board regarding the COVID-19 response.

Albert Scholl spoke to the Board regarding mandatory vaccination and masking.

Peggy Walker spoke to the Board regarding National Suicide Awareness Month.

Kelly McCormick spoke to the Board regarding commercial marijuana industry.

Carol Green spoke to the Board regarding suicide prevention and mental health focus.

Craig Logan spoke to the Board regarding the Borrego Springs Planning Group and marijuana business in unincorporated areas.

Adam Fischer spoke to the Board regarding wearing masks indoors.

Jason Robo spoke to the Board regarding cannabis.

Melissa Grace spoke to the Board regarding discontent.

Audra Morgan spoke to the Board regarding public meetings and compassion.

Paul Hegyi spoke to the Board regarding make and vaccine mandates.

**EXHIBIT A**
**059**

**ACTION:**
Heard, Referred to the Chief Administrative Officer.

The Board adjourned the Tuesday session on Wednesday, September 1, 2021 at 12:28 a.m. in memory of Virginia Sanchez.

ANDREW POTTER
Clerk of the Board of Supervisors
County of San Diego, State of California

Consent: Ruffier
Discussion: Zurita

NOTE: This Statement of Proceedings sets forth all actions taken by the County of San Diego Board of Supervisors on the matters stated, but not necessarily the chronological sequence in which the matters were taken up.

**EXHIBIT A**
**060**

THIS PAGE IS INTENTIONALLY LEFT BLANK.